M. & C. CREDITORS CORPORATION, Plaintiff, *v.* ALEXANDER D. B. PRATT and MARY GORDON PRATT, Individually and as Executors, etc., of DALLAS B. PRATT, Deceased, and Others, Defendants.*

Supreme Court, New York County, February 10, 1938.

* Unanimously affd., without opinion, 255 App. Div. 838; leave to appeal to Court of Appeals granted, 280 N. Y. 850; affd., without opinion, 281 id. ——.

*Engelhard, Pitcher & Amann* [*George H. Engelhard* of counsel], for the plaintiff.

*Stewart & Shearer* [*W. A. W. Stewart* and *M'Cready Sykes* of counsel], for the defendants.

GEORGE SYLVESTER, Referee. In this action for an accounting, plaintiff seeks, in effect, to recover back an alleged overpayment made in 1929 to the executors of Dallas B. Pratt, who, prior to his death on October 9, 1929, was a partner in the private banking firm of Maitland, Coppell & Co. (hereinafter referred to as the old firm). Upon Pratt's death, the surviving partners organized a new firm under the same name to continue the business. The payment in question, amounting to $424,394.11, was made by the new firm and was intended to represent Pratt's interest in the firm as of the date of his death.

Plaintiff contends that ascertainment of Pratt's interest was improperly made as of the date of his death; that liquidation was essential in order to determine the amount due; and that, in any event, his estate should have been charged with the depreciation in the value of the firm's securities which occurred between the date of his death and the date of payment. It is further claimed that the computation of Pratt's interest erroneously included a con-

sideration of the firm's Stock Exchange seat, contended to have belonged to one of the partners and to have been available only to partnership creditors.

*The Parties.*— This action was begun by M. & C. Creditors Corporation on August 13, 1934. The stock of the plaintiff corporation is owned by George Myers Church, who was admitted to a twenty per cent interest in the new firm, organized as of October 21, 1929. When, in 1932, an involuntary petition in bankruptcy was filed against the new firm, the original partners having died in the interim, Church financed the composition agreement that was eventually executed. The creditors having been satisfied by the payment of seventy-five per cent of their claims, all the assets of the firm were assigned to the plaintiff.

The action is brought against Alexander D. B. Pratt and Mary Gordon Pratt, individually and as executors of the last will and testament of Dallas B. Pratt, and Alexander D. B. Pratt, Walter N. Stillman and United States Trust Company, as trustees under Pratt's will. On September 28, 1932, Pratt's estate was settled by surrogate's decree and the assets distributed. The defendant Alexander D. B. Pratt received $148,479.74; Mary Gordon Pratt, $5,638.55; and the trustees, $412,584.56. The complaint was filed on August 11, 1934. On May 24, 1937, the parties consented in open court, pursuant to section 464 of the Civil Practice Act, to have all the issues heard and determined by a referee.

*Maitland, Coppell & Co.*— The partnership of Maitland, Coppell & Co. existed for many years. It underwent dissolutions and organizations of successor partnerships, from time to time, as old partners died or new partners were admitted. The firm, here referred to as the " old firm," was organized on June 21, 1929, upon the death of one of the partners, R. Walter Leigh. The surviving partners at that time, in addition to Pratt, were Herbert and Arthur Coppell and Frederick H. Amerman.

*Assets of Firm on October 9, 1929.*— Upon the death of Pratt on October 9, 1929, the books showed credits to the account of Pratt and Amerman of $424,394.11 and $6,821.53 respectively. Herbert and Arthur Coppell were in debt to the firm in varying amounts.

The firm assets at that time amounted to $5,710,795.07, which included Coppell's seat on the New York Stock Exchange, valued at $625,000, and $1,382,346.88 in securities at their market price. The firm's liabilities were $5,085,795.07.

The following statement of the firm's assets and liabilities was stipulated by the parties:

## October 9, 1929

### Assets Available for Creditors.

| | | |
|---|---:|---:|
| Cash with New York banks......... | $285,932 18 | |
| Cash with foreign banks and bankers. | 171,192 06 | |
| | | $457,124 24 |
| Loans on time............................... | | 3,900 00 |
| Bills receivable............................. | | 40,000 00 |
| Coffee account.............................. | | 2,348 66 |
| Sundry advances............................. | | 2,425,706 90 |
| Securities of the firm at market prices October 9, 1929.................................. | | 1,382,346 88 |
| | | $4,311,426 68 |
| Herbert Coppell's debit balance (secured by securities of greater value)......................... | | 608,494 13 |
| Arthur Coppell's debit balance (secured by securities worth, on October 9, 1929, $114.020)........... | | 165,874 26 |
| | | $5,085,795 07 |
| Herbert Coppell's New York Stock Exchange seat was also an asset as provided in the partnership agreement. Its market value on the above date was approximately........................... | | 625,000 00 |
| | | $5,710,795 07 |

### Liabilities.

| | | |
|---|---:|---:|
| Sundry deposits and accounts payable............ | | $4,283,939 64 |
| Accrued interest............................. | | 20,938 19 |
| Loans on call................................ | | 349,700 00 |
| Adjustment not identified ...................... | | 1 60 |
| Dallas B. Pratt...................... | $424,394 11 | |
| Frederick H. Amerman............. | 6,821 53 | |
| | | 431,215 64 |
| | | $5,085,795 07 |

It appears from the foregoing statement that Pratt and Amerman were the only partners with a credit or equity in the firm and that the firm's assets, excluding the Stock Exchange seat, were adequate to satisfy their interests.

*Pratt's Interest.*— Pratt's credit of $424,394.11 was arrived at as follows:

The books show that on September 30, 1927, the date of the organization of the firm which continued to Leigh's death on June 21, 1929, the following amounts were standing to the credit or debit of the partners:

Pratt, credit of $287,751.68.

H. Coppell, debit of $137,338.05.

A. Coppell, debit of $83,571.65.

Leigh, credit of $35,520.34.

A distribution in kind of all the assets of that firm was made among the partners, each partner assuming his share of the firm's liabilities. This distribution was a bookkeeping transaction merely, no assets being actually distributed. Entries were simply made upon the books, crediting each partner with his proportionate share in each of the firm's assets and debiting him with his share of the firm's liabilities. At this time, the assets and liabilities, apart from the partner's accounts and excluding the Stock Exchange seat, were:

Assets..................................... $5,554,812 80
Liabilities................................. 5,452,450 48

Surplus................................. $102,362 32

The effect of the distribution of assets was to credit each partner with that proportion of the surplus which corresponded with the percentage of his interest in the firm, to wit:

Pratt, 32-1/2%, $33,267.76.

H. Coppell, 23%, $23,543.33.

A. Coppell, 23%, $23,543 33.

Leigh, 21-1/2%, $22,007.90.

Since H. Coppell had a net debit of $137,338.05 after deducting his share of the firm's assets of $23,543.33, his total withdrawals appear to have been $160,881.38. He was, therefore, required to pay this to Pratt and Leigh in order to make up the amount of the credits to which each of the latter was entitled. Similarly, A. Coppell was required to make good a withdrawal of $107,114.98.

This transaction may be summarized in tabular form, as follows:

Pratt...... Credit, $287,751.68.... Distribution in kind,.......... $33,267.76
 Paid by H. Coppell.......... 147,368.94
 Paid by A. Coppell.......... 107,114 98
Leigh..... Credit, $35,520.34..... Distribution in kind,........ 22,007.90
 Paid by H. Coppell.......... 13,512.44
H. Coppell. Withdrawal,$160,881.38 Distribution in kind, $23,543.33 Paid to
 Pratt,
 147,368.94

Net debit, $137,338.05....... Paid to
Leigh,
13,512.44

A. Coppell. Withdrawal, $107,114.98 Distribution in kind, $23,545.33 Paid to
Net debit, $83,571.65........ Pratt,
107,114.98

After the distribution the assets of the firm were written up to reflect an appreciation amounting to $145,445.30 in the value of the firm's securities which had occurred up to October 1, 1927, the securities having been theretofore carried at cost.

This write-up increased each partner's *pro rata* share in the firm's surplus as follows:

| | Per cent | As of 9/30/27 | Incr. by write-up | As of 10/1/27 |
|---|---|---|---|---|
| Pratt.................. | 32½ | $33,267 76 | $47,269 72 | $80,537 48 |
| H. Coppell............ | 23 | 23,543 33 | 33,452 42 | 56,995 75 |
| A. Coppell............ | 23 | 23,543 33 | 33,452 42 | 56,995 75 |
| Leigh................. | 21½ | 22,007 90 | 31,270 74 | 53,278 64 |
| | 100 | $102,362 32 | $145,445 30 | $247,807 62 |

Each such share was designated on the books of the firm as the respective partner's contribution to the capital of the partnership formed as of October 1, 1927. Thereafter, although the firm was twice dissolved, once upon Leigh's death in June, 1929, and again on Pratt's death on October 9, 1929, no further distributions in kind of the firm's assets were made nor were any further entries designated as contributions to capital.

Pratt's credit, amounting to $287,751.68, of which $80,537.48 was designated as contribution to capital, was built up to $424,394.11 on October 9, 1929, as a result of " sundry deposits of interest and dividends of his own investments; proceeds of the sale of his investments, interest credited to him on his firm account, his share of the firm profit allotted to him at regular intervals and his deposit of moneys."

The figures are as follows:

| | Credits |
|---|---|
| Capital contribution, 10/1/27..................................... | $80,537 48 |
| From H. Coppell............................................. | 147,368 94 |
| From A. Coppell............................................. | 107,114 98 |
| Sales of stock.............................................. | 277,687 16 |
| Profits..................................................... | 110,598 72 |
| Interest on his balance....................................... | 53,214 35 |
| Dividends.................................................. | 13,938 47 |
| Mortgage collections......................................... | 8,270 24 |

| | | |
|---|---:|---:|
| Interest on investments............................................. | $1,539 | 14 |
| Cash deposits...................................................... | 1,889 | 53 |
| Maitland, Coppell & Co., of 9/30/27 in liquidation............... | 877 | 82 |
| Adjustment cross-entry............................................ | 35 | 90 |
| | $803,072 | 73 |
| | Debits | |
| Personal debits................................................... | $299,503 | 04 |
| Share of losses — 1/1/29 to 10/9/29............................. | 75,925 | 58 |
| Reserve for firm bonuses......................................... | 3,250 | 00 |
| | $378,678 | 62 |
| Total credits..................................................... | $803,072 | 73 |
| Total debits...................................................... | 378,678 | 62 |
| Net credits..................................................... | $424,394 | 11 |

*Assets of the New Firm as of October 21, 1929.*— When the new partnership was organized on October 21, 1929, with Church as a member, it took over the assets of the old firm and assumed its liabilities, continuing its business without interruption.

It is urged that, whatever may be said of the propriety of charging Pratt's estate with depreciation in the firm's assets to December 13, 1929, the liability of the new firm could not, upon any theory, be greater than the value of Pratt's interest as of October 21, 1929, the day the liability was assumed. At that time the firm's securities having depreciated in value from $1,382,346.88 to $1,319,797.24 (including the proceeds of securities sold), it is insisted that Pratt's estate must be charged with this decline in value, which amounts to $62,549.64.*

As of October 21, 1929, the firm's assets and liabilities were as follows:

| | | |
|---|---:|---:|
| * The actual amount claimed is $56,846.33. | | |
| This figure is arrived at by plaintiff as follows: | | |
| Firm assets, other than securities and Stock Exchange seat, as of October 9, 1929........................................... | $3,703,448 | 19 |
| Value of securities as of October 21, 1929, including proceeds of securities sold.................................................. | 1,319,797 | 24 |
| | $5,023,245 | 43 |
| Firm liabilities, other than to partners, as of October 9, 1929.... | $4,654,579 | 43 |
| Surplus available to Pratt...................................... | 368,666 | 03 |
| Pratt's credit.................................................. | 425,512 | 03 |
| Overpayment claimed........................................... | 56,846 | 33 |

| Assets | | | Liabilities | | |
|---|---|---|---|---|---|
| Various............... | $5,106,759 | 12 | Various.............. | $5,996,743 | 11 |
| Securities at market price.............. | 1,255,102 | 54 | Dallas B. Pratt......... | *425,512 | 33 |
| Coppell's seat........ | 625,000 | 00 | F. H. Amerman...... | 5,849 | 75 |
| Total........... | $6,986,861 | 66 | Total........... | $6,428,105 | 19 |

*Payments by New Firm to Pratt's Estate.*— On October 30, 1929, a check in the amount of $100,000, signed by Maitland, Coppell & Co., was sent to Pratt's executors. Although there is no evidence in the record as to the circumstances surrounding this payment, it is conceded that it was made on account of the firm's obligation to Pratt.

Thereafter, on December 12, 1929, Alexander D. B. Pratt, as executor of Dallas B. Pratt, wrote to Maitland, Coppell & Co. requesting that an additional payment of $300,000 be made " out of the balance now remaining in my father's estate." Accordingly, on the next day, December 13, 1929, a check for $300,000, signed by the firm, was delivered to the executors.

On January 6, 1930, Stewart & Shearer, attorneys for the executors of Dallas B. Pratt, received a memorandum from Maitland, Coppell & Co. inclosing a book of account stamped " Dallas B. Pratt, Esqr. No. 9," containing the entries of debits and credits made in Pratt's account to December 31, 1929. The book showed that, as of that date, a balance of $25,510.52 was due. This sum was subsequently paid.

*Assets of New Firm as of December 13, 1929.*— On December 13, 1929, the value of the firm's securities had declined to $1,111,106.34, including the proceeds of securities sold. The depreciation amounted to $271,240.54.†

* The increase of $1,118.22 in the amount of Pratt's credit was the result of various personal transactions handled for him by the firm.

† The actual amount claimed is computed by plaintiff as follows:

| | | |
|---|---|---|
| Firm assets, other than securities and Stock Exchange seat, as of October 9, 1929...................................... | $3,703,448 | 19 |
| Value of securities as of December 13, 1929, including proceeds of securities sold...................................... | 1,111,106 | 74 |
| | $4,814,554 | 93 |

The stipulated statement of the firm's assets and liabilities as of December 13, 1929, shows:

| Assets | | | Liabilities | | |
|---|---|---|---|---|---|
| Various | $3,697,872 | 66 | Deposits | $4,821,297 | 37 |
| Stocks at market | 1,195,632 | 45 | Dallas B. Pratt | 316,065 | 10 |
| Stock Exchange seat | 530,000 | 00 | | | |
| Total | $5,423,505 | 11 | Total | $5,137,362 | 47 |

(The $100,000 payment of October 30, 1929, and sundry personal transactions, involving a net debit of $9,447.23, are reflected in Pratt's credit.)

It is contended by the plaintiff that H. Coppell's Stock Exchange seat, though available to satisfy creditors' claims, did not constitute capital and was not to be treated as such in computing Pratt's interest.

*Settlement of Pratt's Estate.*— The defendants Alexander D. B. Pratt and Mary Gordon Pratt, as executors of the will of Dallas B. Pratt, filed their account as such executors in the office of the surrogate of the county of New York. On September 28, 1932, the surrogate by decree settled the account and directed the executors to distribute the decedent's assets, which included the proceeds of his interest in the old firm, to the defendants Alexander D. B. Pratt and Mary Gordon Pratt, individually, and to the defendants Alexander D. B. Pratt, Walter N. Stillman and the United States Trust Company of New York, as trustees under the will of Dallas B. Pratt.

*Subsequent Insolvency of New Firm.*— The business of the firm was continued until January 2, 1932, when a petition in involuntary bankruptcy was filed against the new firm in the United States District Court for the Southern District of New York. A receiver

Firm liabilities as of October 9, 1929, other than to partners..... $4,654,579 43

Surplus available to Pratt ..... $159,975 50
Paid to Pratt ..... $425,510 52
Overpayment claimed ..... 265,535 02

[The overpayment claimed should read $265,535.42, since the value of the securities is actually $1,111,106.34.]

and a trustee in bankruptcy were appointed and a creditors' committee organized. Thereafter the remaining assets of the firm were assigned to the plaintiff.

*Actions Brought in 1934.*— No action was taken with respect to the payments made to Pratt's executors in 1929 until this action was begun in 1934. To explain the delay, Church testified that when he joined the new firm in November, 1929,* he made no inquiries and was not advised about Pratt's share in the assets or the payments made or contemplated to be made to Pratt's estate.

He said that he left for Texas on November 30, 1929, and did not return to New York until June of the following year. While he was not active in the firm's business during this period he received monthly statements showing only the status of his personal account. Thereafter, although he made other visits to New York, he made no inquiry into the firm's affairs until Herbert Coppell died on October 29, 1931. He then learned for the first time from Amerman that payments had been made to Pratt's executors, but did not think of bringing suit until July 24, 1932, when the books of the firm were turned over to him upon the execution of the composition agreement. No explanation was given for his failure to bring the suit until August of 1934.

He made no claim that anything was concealed from him or that, as a general partner, he did not have free access to the firm's books.

*Church's Interest in Firm.*— Church made no contribution to the new firm which he entered on October 21, 1929. Indeed, at that time he had a debit balance with the firm, as a result of prior dealings, of $15,126.95. By December 31, 1929, this debit was increased to $21,575.49 by further payments made to him or for his account.

*The Issues Presented.*— 1. Plaintiff asserts that Pratt's representatives were not legally entitled to the sum of $424,394.11, which represented Pratt's interest as of the date of his death. It is said, further, that the Stock Exchange seat should not have been included in computing Pratt's interest in the firm. This contention does not become material unless Pratt's interest is not to be ascertained as of October 9, 1929, when the assets of the firm, exclusive of the Stock Exchange seat, were adequate to meet all obligations to creditors, including Pratt.

2. Assuming that Pratt's estate was not entitled to its share in the partnership assets, computed as of October 9, 1929, several further questions arise. Surviving partners may agree with the

---

* Although the new firm was organized as of October 21, 1929, the agreement was executed on November 18, 1929.

representatives of a deceased partner upon an adjustment of the deceased's partner's interest in the firm. Payments made in accordance with such an adjustment are binding in the absence of mistake or fraud. (*Sage* v. *Woodin,* 66 N. Y. 578 [1876]; *Matter of Silkman,* 121 App. Div. 202 [2d Dept. 1907]; affd., 190 N. Y. 560.)

3. The defendants plead an account stated, which is urged as conclusive in the absence of fraud or mistake.

4. It is further urged that even if there were no binding adjustment of partnership affairs and no account was stated, there may be no recovery because the payments were voluntarily made, with knowledge of the facts.

5. Assuming that the payment was erroneous; that there was no lawful settlement of the partnership affairs; no effective account stated; and that a payment voluntarily made may be recovered back, nevertheless, it is claimed that the commencement of this action after the lapse of five years from the date of payment, the subsequent settlement of the decedent's estate, and the distribution of the assets, constitute such laches as will debar the plaintiff from maintaining this suit.

*Plaintiff's Position in the Complaint.*— The material allegations of the complaint recite that prior to January 31, 1930, Herbert Coppell, Arthur Coppell and Frederick Maitland, without any consideration, paid to Pratt's executors sums aggregating $424,394.11 and delivered to the executors securities valued at $240,482.50 as Pratt's share in the assets of the original partnership, in which the executors claimed to be entitled; that at the time of Pratt's death the liabilities of the firm were largely in excess of its assets and the executors were not entitled to receive any payment by reason of Pratt's membership in the firm; that the money and securities paid over belonged to the new partnership and neither of the firms was indebted to Pratt in any sum whatever or held any property belonging to him, of which facts the executors had notice; that the payments were made without Church's consent and without knowledge on his part that the executors were not entitled to this payment; and that on June 24, 1932, the new firm assigned to the plaintiff its interest in the claim alleged.

*Plaintiff's Position at the Trial.*— Upon the trial, and in the stipulation of facts, plaintiff, departing from the allegations in its complaint, conceded, among other things, that the firm was not insolvent on any of the material dates alleged in the complaint; that the securities delivered to Pratt's executors were rightfully his; and that the claim of overpayment was based, not on the absence of consideration, but upon the depreciation in the value of the

securities and the inclusion of the Stock Exchange seat as a firm asset.

*Propriety of Ascertaining Pratt's Interest as of October 9, 1929.*— On October 9, 1929, the firm had assets of $5,710,795.07 available for creditors, of which $625,000 represented the Stock Exchange seat. Since the liabilities of the firm as of that date to outside creditors amounted to $4,654,577.83, there was available the sum of $431,217.24 to satisfy the creditors of Pratt and Amerman without having recourse to the seat.

Upon dissolution of a partnership the surviving partners are required to close up the partnership affairs, dispose of the assets, pay all creditors, and remit the decedent's share to his representatives. (*Williams* v. *Whedon,* 109 N. Y. 333 [1888]; *Preston* v. *Fitch,* 137 id. 41 [1893]; Partnership Law, § 74.)

The plaintiff contends that the continuance of the business does not affect the obligation of the firm to liquidate; that, without such liquidation, no payment could properly be made to Pratt's estate, since the surplus available for partners could not be determined until the assets had been sold and all liabilities paid. No direct authority is cited in support of this view. Plaintiff is satisfied to refer to cases holding that the representatives of a deceased partner have the right to require liquidation; that, until such liquidation is completed, they have no interest in the assets of the partnership; that legal title is vested in surviving partners and that the right of the executors remains a contingency, a mere chose in action, until liquidation.

Plaintiff's interpretation would require the representatives of the deceased partner to force a liquidation, thus jeopardizing the continued business; or, in the alternative, to wait indefinitely for payment of the decedent's interest. Ordinary considerations of fairness and justice require that plaintiff's views should not prevail unless rendered unavoidable by decisive authority. No such authority has been cited to the referee nor has he been able to discover any.

On the contrary, section 73 of the Partnership Law explicitly provides:

" § 73. Rights of retiring or estate of deceased partner when the business is continued. When any partner retires or dies, and the business is continued under any of the conditions set forth in sections seventy-two, subdivisions one, two, three, five and six, or section sixty-nine, paragraph (b) of subdivision two, without any settlement of accounts as between him or his estate and the person or partnership continuing the business, unless otherwise

agreed, he or his legal representative as against such persons or partnership may have the value of his interest at the date of dissolution ascertained, and shall receive as an ordinary creditor an amount equal to the value of his interest in the dissolved partnership with interest, or, at his option or at the option of his legal representative, in lieu of interest, the profits attributable to the use of his right in the property of the dissolved partnership; provided that the creditors of the dissolved partnership as against the separate creditors, or the representative of the retired or deceased partner, shall have priority on any claim arising under this section, as provided by section seventy-two, subdivision eight of this chapter."

Section 72, referred to in section 73, is designed to protect the creditors of a partnership which, dissolved by a change in membership, nevertheless proceeds with its business. Subdivision 3 of section 72 is applicable here: "When any partner retires or dies and the business of the dissolved partnership is continued as set forth in subdivisions one and two of this section, with the consent of the retired partners or the representative of the deceased partner, but without any assignment of his right in partnership property, rights of creditors of the dissolved partnership and of the creditors of the person or partnership continuing the business shall be as if such assignment had been made."

The reference here to continuance of the business "as set forth in subdivisions one and two" is to the continuance of business "without liquidation of the partnership affairs."

Section 73 is decisive of the plaintiff's contention, unless it be said that the absence of consent of Pratt's executors to the continuance in business renders this provision inoperative.

The purpose of subdivision 3 of section 72 is to render available to creditors the share of the deceased partner in the assets of the firm where his representatives have consented to the continuance of the business. In this case the rights of creditors are not involved. Section 73 provides that where the rights of creditors are not involved the representatives of the deceased partner may have his share of the assets ascertained as of the date of death. The requirement of consent by the decedent's representatives to a continuance of the business is a prerequisite to subjecting the decedent's interest to creditors of the continuing business. It could not have been intended to limit the rights of the representatives to require payment of the decedent's interest as of the date of death.

This construction of section 73 has been indicated in *Cahill* v. *Haff* (248 N. Y. 377 [1928]), where Judge ANDREWS said (at p. 380): "It is clear that the surviving partner may be required to account

for the firm transactions and for transactions requisite to wind up the firm's business. That at least he must do. * * *. If the son, for example, continues the partnership business, with no accounting, retaining and using therein capital belonging to the estate of the father, with the consent express or implied of his representatives, the latter are entitled at their option to receive the profits attributable to the use of his rights in the property of the dissolved partnership. (Partnership Law [Cons. Laws, ch. 39], § 73 — merely a statement of the pre-existing law; Pollock on Partnership, p. 133.) *Probably the same thing is true if there be no consent.*" (Referee's italics.)

As indicated by Judge ANDREWS, section 73 is expressive of the common-law rule that where the surviving partners of a business continue to use the interest of a deceased partner in the conduct of the firm's affairs they must account to the representatives of the decedent, not only for the value of his share at the date of his death, but also for profits earned which may be attributed to that value. On the other hand, all losses are required to be borne entirely by the surviving partners.

It is said that the language of the court in *Cahill* v. *Haff* (*supra*) simply means that the decedent's representatives are entitled to a liquidation to ascertain the value at the date of death and not to an appraisal or other computation, not based on actual liquidation. The court's opinion is to the contrary (pp. 385, 386):

" The executrix, therefore, at her election is entitled to receive the profits attributable to the use of this capital and for it also the son must account at least to the date of any new trial. At the time of his death, therefore, did the deceased have capital therein? * * *

" As appears by the referee's report, on February 22, 1919 [date of death], the assets of the firm amounted to $265,160.90. Its liabilities were $241,076.25. The balance is $24,084.65. If this were all it would seem that the father at his death still had invested therein $12,042.33."

Thus it appears that the court took the valuation at the date of death without requiring liquidation.

It is further urged by defendants that section 73 is specifically made applicable by subdivision 1 of section 72, which applies " when any new partner is admitted into an existing partnership." It is contended that the instant case falls precisely within this category. On November 18, 1929, the partners signed an agreement, effective as of its date, October 21, 1929, whereby " It is mutually agreed to continue the partnership above referred to

[the old firm] until December 31, 1930, upon like conditions except that George Myers Church is admitted to the firm as of this date."

Subdivision 1 of section 72, dealing with the admission of new partners, appears to be inapplicable since, among other things, section 73 is, in terms, confined to cases of the dissolution of partnerships by death or retirement. The point, however, is immaterial since the applicability of section 73 has already been determined.

The common-law rule is stated as follows in Story on Partnership ([7th ed.] § 343): " If they [the surviving partners] act otherwise, and continue the trade or business, it is at their own risk, and they will be liable, at the option of the representatives of the deceased partner, to account for the profits made thereby, or to be charged with interest upon the deceased partner's share of the surplus, *besides bearing all the losses.*" (Italics supplied.)

In *Skidmore* v. *Collier* (8 Hun, 50 [2d Dept. 1876]) the court said, per GILBERT, J. (at p. 54): " It is the duty of the surviving partner to wind up the affairs of the partnership, and to account for, and pay over to the personal representative of the deceased partner his share of the partnership effects. If he has continued the partnership business with the partnership funds, he is, as a general rule, liable to account for all profits made thereby, *and the losses, if any, must be borne by himself.*" (Referee's italics.)

In *Cheeseman* v. *Wiggins* (1 Thompson & Cook, 595 [Gen. Term, 4th Dept. 1873]) the court said, per MULLEN, P. J. (at p. 597): " On the death of Mead, the copartnership was dissolved, and no person was authorized to continue it and bind either the survivor or the representatives of the deceased (Story on Part., § 342). * * * the rights of the plaintiff as the representative of Mead must be determined as of the time of his death. The continuance of the business was wholly at the risk of the defendant as survivor, and he must account for the property of the firm as it was at the dissolution. (Story on Part., § 343.)"

In that case, the relief sought required the partner continuing the business to liquidate and account to the plaintiff for the assets as they were at the date of death, unimpaired by subsequent losses. It does not follow, however, as has been argued, that the plaintiff in that case, by waiving his right to force liquidation, could not have required the defendant to pay whatever sums, if any, appeared to the deceased partner's credit on the books at the time of his death without liquidation.

The rule is stated as follows in 2 Rowley's Modern Law of Partnership (§ 638): " A surviving partner has no authority to continue the business, but must wind it up, and if he does continue it he is answerable for all debts which he incurs, and for loss and depreciation thus occasioned."

In *Froess* v. *Froess* (284 Penn. St. 369; 131 A. 276 [1925]) the surviving partner had continued the business for some time following the death of one of the partners. The court, in applying a provision identical with that here involved, said, per SADLER, J. (at p. 374): "The determination of the right of the deceased partner where there has been no agreement to continue the business or dispose of the estate's interest for a fixed sum * * * may be controlled by an election of the personal representative of the decedent to take a share of the assets and profits which have been gained by the use of the property prior to actual settlement. [Citing cases.] Or, in lieu of the latter, interest may be demanded on the value of the property estimated as of the date of dissolution."

Quoting from *Matter of Brown* (89 Penn. St. 139) the court continued (at p. 147): "If the survivors of a partnership carry on the concern, and enter into new transactions with the partnership funds, they do so at their peril * * *. † If no profits are made, or even if a loss is incurred, they must be charged with interest on the funds they use, and the whole loss will be theirs."

In *Mattson* v. *Wagstad* (188 Wis. 566; 206 N. W. 865 [1926]) the court construed a provision identical with section 73 of the Partnership Law, as conferring an option upon the deceased partner's representatives to "the value of the interest at the date of dissolution."

This doctrine is also established by statute in England (English Partnership Act, 1890; 53–54 Vict. Ch. 39).

The authorities cited by plaintiff to the proposition that the exclusive right of the representatives of a deceased partner is to compel liquidation where the surviving partners continue the business, are not in point.

In *Moore* v. *Huntington* (84 U. S. 417 [1873]), cited by the plaintiff, the court, per Mr. Justice MILLER, said (at pp. 423, 424): "It was a legal right of the defendants, as surviving partners, to close out the concern, collect and dispose of its choses in action, and its property, pay what it owed, and then pay over to the plaintiff her just share of what was left. They were not bound to become purchasers of the decedent's interest at a valuation. But they were bound to use reasonable diligence and care in closing out the business, and in taking care of the decedent's interest."

That case did not deal with the obligation of the surviving partners where the business is continued. The court was merely considering whether the liquidation in that case had been diligently

---

† The part of the quotation omitted is as follows (p. 147): "and the representative of the deceased may elect to call on them for the capital, with a share of the profits, or with interest."

or negligently carried out. The case was not regarded as one involving the continuance of the business although, as appears from the record on appeal, the complaint charged that the defendant continued the business.

In *Germann* v. *Jones* (220 App. Div. 5 [4th Dept. 1927]), cited by plaintiff, the representatives of a deceased partner sued the continuing partner for a liquidation and accounting. This relief was denied in the lower court on the ground that section 73 of the Partnership Law required the plaintiff to accept a date of death appraisal. On appeal, liquidation was ordered, the court holding that section 73, having been adopted subsequent to the commencement of the litigation, was inapplicable. The case is not authority for the proposition that under section 73 the decedent's representatives are to be limited to the relief there granted.

In *People ex rel. Whitney* v. *Loughman* (226 App. Div. 108 [3d Dept.1929]), relied upon by plaintiff, the State Tax Commission had assessed an additional income tax against the relators, who were executors of the estate of a deceased partner in a brokerage firm. The assessment was based on a payment of $80,000 made to the estate by the surviving partners out of the proceeds of liquidation which had been commenced shortly after the decedent's death. The decedent's interest in the firm having been appraised as worthless for transfer tax purposes, the Tax Commission contended that the $80,000 was taxable income. Rejecting this contention, the court held that the money represented a collection of part of the original estate and represented the receipt of capital, not income. It said, per HINMAN, J. (at p. 111): " The value of a chose in action, such as the unliquidated claim of the estate of a deceased partner to the partnership interest belonging to the estate, may be so uncertain and contingent at the time of death as to seem to have no market value and yet have a value which can only be determined at some date subsequent to the death of the decedent when a liquidation of the partnership has been had. * * * Its [the State's] failure to assess a proper transfer tax is no justification for assessing an income tax on a basis not clearly found in the law governing the collection of the latter tax."

The case has no bearing upon the right of the decedent's representatives to require a date of death computation where the business is continued.

Similarly, the other cases cited by plaintiff do not extend beyond the holding that the representatives of a deceased partner have the right to require liquidation. Certainly, none of them decides that the decedent's representatives may not receive payment based

on the value of the decedent's interest at the date of death where the partnership business is continued.

Plaintiff cites *Preston* v. *Fitch* (137 N. Y. 41 [1893]), where the court said, per PECKHAM, J. (at p. 57): " It is admitted by all that certain rights are conferred upon the representatives of the estate of a deceased partner as against the survivor, and *among them is* a right to call him to account with reference to his conduct or administration of the assets of the late firm; also a right to compel their application to the payment of the debts of the firm, and to summon him to an accounting and to the payment to them of any balance that may be due the estate." (Referee's italics.)

*King* v. *Leighton* (100 N. Y. 386 [1885]), cited by plaintiff, indicates plainly that, though liquidation may be required, the surviving partners may, nevertheless, acquire by purchase from the decedent's representatives the right to continue the business. The court said, per RUGER, Ch. J. (at p. 391): " When the firm became dissolved by the plaintiff's bankruptcy it was not permissible for the defendant to take new contracts and carry on the business in its name, and being apparently desirous of still continuing in the same line of business at the same place, it became necessary for him to first acquire that right from the plaintiff or his assignee."

The uninterrupted line of authority, culminating in section 73 of the Partnership Law, sustains the right of Pratt's executors to require payment of the value of Pratt's interest, ascertained as of the date of his death.

*Pratt a Creditor of Firm.*— It has thus far been assumed that Pratt's interest constituted a share of the capital of the partnership. The defendants insist, however, that Pratt's interest represented a debt of the firm which, being fixed in amount, could not be affected by depreciation of the partnership assets. It is argued that on October 9, 1929, the firm of Maitland, Coppell & Co. owed Pratt over $424,000, and that neither appraisal nor liquidation was necessary to ascertain the amount of his claim.

Capital consists of money required of the partners by the partnership agreement. Sums voluntarily contributed for the use of the partnership over and beyond that amount represent an advance to the firm.

In *Levy* v. *Leavitt* (257 N. Y. 461) LEHMAN, J. said (at p. 471): " to the extent that the partnership agreement fails to impose an obligation upon the partners to furnish capital requisite for the conduct of the business, the parties to the contract must intend that money will be borrowed to carry on the business and that interest will be paid on money borrowed. Therefore, where a partner pays

money to the partnership beyond his partnership obligation, it is a reasonable inference that the parties intended that such payment should be a loan and should bear interest."

Pratt's capital contribution of $80,537.48, designated as such in the organization of the firm of October 1, 1927, had been reduced to $1,361.90 on October 9, 1929. This computation is arrived at as follows:

| | | |
|---|---:|---:|
| Capital contribution October 1, 1927 | | $80,537 48 |
| Less share of $10,000 reserved for bonuses October 27, 1927 | $3,250 00 | |
| Less his share of firm losses January 1, 1929, to October 9, 1929 | 75,925 58 | |
| | | 79,175 58 |
| Capital, October 9, 1929 | | $1,361 90 |

It is contended, however, by the defendants that not even this $1,361.90 constituted capital. Defendants point out that it appears on examination of the entries of September 30 and October 1, 1927, that the amount of Pratt's capital contribution ($33,267.76 as of September 30) was exactly 32-1/2% of $102,362.32. This sum represented not only the amount of the net assets of the firm, disregarding the partners' accounts, but, stating the same thing in another way, was equal to the excess of partners' total credit balances over partners' total debit balances.

It is argued that since no other method of ascertaining capital appears on the partnership books, the difference between partners' credits and debits or the firm's net assets, apart from partners' accounts, determines the amount of the firm's capital as of any particular date. Thus, on September 30, 1927, the net credit balance of the partners as a whole was determined as follows:

| | Debit balance | Credit balance |
|---|---:|---:|
| Pratt | | $287,751 68 |
| Herbert Coppell | $137,338 05 | |
| Arthur Coppell | 83,571 65 | |
| Leigh | | 35,520 34 |
| | $220,909 70 | $323,272 02 |
| | | 220,909 70 |
| Capital, or net credit balance of partners as a whole | | $102,362 32 |

Applying this formula to the partners' accounts as of October 9, 1929, it appears that since the partners' debits exceeded their credits, there was no partnership capital. The computation is as follows:

| | Debit balance | Credit balance |
|---|---|---|
| Pratt................................ | ............ | $424,394 11 |
| Herbert Coppell.................... | $608,494 13 | ............ |
| Arthur Coppell..................... | 165,874 26 | ............ |
| | $774,368 39 | $424,394 11 |
| | 424,394 11 | |
| Partners' net borrowings........ | $349,974 28 | |

Since the partners' debit balances were good and the Stock Exchange seat was available for creditors, this excess of partners' borrowings did not mean that the firm was insolvent.

There is no satisfactory evidence in the record that the manner of arriving at capital in 1927 was intended by the partners to be the method by which all future determinations of capital were to be arrived at. This contention, however, is immaterial in view of the determination that Pratt's interest was properly ascertained as of October 9, 1929. Whether the $1,361.90 represented capital or a firm obligation, it was properly payable as of Pratt's death.

The items credited to Pratt's account between October 1, 1927, and October 9, 1929, may not arbitrarily be characterized as contributions to capital. They were not designated as such. It suggests itself that the other partners would have been required to make proportionate contributions if they had regarded Pratt's advances as capital. It was conceded that no such payments were made.

Plaintiff relies on the fact that in the October 1, 1927, " distribution in kind," Pratt was not paid his credit of $287,751.68 before the " distribution " was made to the other partners. It argues that if Pratt's interest represented a firm liability, it would have to be deducted from assets before a distribution among the partners could properly be made. There is no claim that the method of computation affected the result in any way or that Pratt would have been entitled to any other sum had he been paid first and had the distribution followed. It is significant that if this method of adjusting the affairs of the partnership had been adopted, the Coppells, debtors of the firm, would have been required to make good their obligations before it could be determined what assets were available for distribution. The fact that this was not required does not

establish that they were not debtors of the firm. What is involved is merely the method of arriving at the figures. They computed the firm's assets and liabilities independently of the rights and liabilities of the partner, distributed the assets accordingly and then made the necessary partnership adjustments.

There are other factors and circumstances which lead to the view that the money standing to Pratt's credit constituted advances to the firm. It was stipulated that the amount " was made up of successive loans or advances." Although it was further stipulated that nothing was to preclude the plaintiff from contending that the credit in favor of Pratt should be deemed to be capital rather than a credit, it is difficult to perceive why the words " loans or advances " should have a construction ascribed to them contrary to their plain meaning.

Furthermore, the amount standing to Pratt's credit was debited from time to time with moneys paid out for his personal expenses; a positive indication that the money was not intended, as a contribution to the firm's capital, to be thereafter used in the firm's business. It was clearly regarded as a deposit with the firm, reduced from time to time by withdrawals.

In 3 Lindley on Partnership ([8th ed.] p. 382) capital is defined as follows: " By the capital of a partnership is meant the aggregate of the sums contributed by its members for the purpose of commencing or carrying on the partnership business, and intended to be risked by them in that business."

Pratt could have withdrawn his money at will. Neither he nor the other partners contemplated that the money standing to Pratt's credit was irrevocably risked in the business.

The money due Pratt was, therefore, a fixed obligation of the firm. Pratt's representatives were clearly entitled to the payments made.

*Adjustment of Pratt's Interest by Surviving Partners.*— It is unquestionably the law that surviving partners and the representatives of the deceased partner may agree upon an adjustment of the partnership affairs upon any basis they choose, and that in the absence of mistake or fraud, such an adjustment is binding upon all parties to the agreement.

The rule was stated in *Matter of Silkman* (121 App. Div. 202 [2d Dept. 1907]; affd., 190 N. Y. 560 [1907], per JENKS, J., at pp. 207, 208), " ' the executor of a deceased partner, if not a member of the firm, may agree with the survivor that the share of the deceased may be ascertained in a particular way, or be taken at a certain value.' "

In *Sage* v. *Woodin* (66 N. Y. 578 [1876]) the court said, per ANDREWS, J. (at p. 581): " It was, however, competent for the

representatives of Case and the surviving partners to adjust and settle by agreement between themselves the partnership affairs without an accounting or resort to legal proceedings. Such a settlement, in the absence of fraud, would be binding upon the parties to it, subject to be opened for the correction of errors or mistakes, in accordance with the practice and principles of courts of equity. (Parsons on Part. 511, 513; *Ogden* v. *Astor*, 4 Sand. 312.)"

Plaintiff concedes, as the law establishes, that the surviving partners and the representatives of the deceased partner may agree upon an adjustment of the partnership affairs. It contends, however, that there was no such adjustment.

The record establishes that on October 9, 1929, the date of Pratt's death, his account was balanced and a net credit of $424,394.11 arrived at. The " Dallas B. Pratt " account book shows that on the date in question, Pratt's proportion of the losses suffered by the firm from the date of Leigh's death was debited, his share of the interest credited and other personal debits and credits entered. These entries indicate an obvious intention to arrive at Pratt's net interest in the partnership.

Thereafter, $100,000 was paid to Pratt's executors and accepted by them. Although the negotiations which led up to this payment are not shown by the record, it is inferable that the executors regarded it as a payment on account of the sum shown to be due Pratt by the balancing of the partnership books which had taken place on October 9, 1929. On December 12, 1929, Alexander D. B. Pratt wrote Maitland, Coppell & Co. as follows:

" DEAR SIRS: I have been advised by my attorneys, Messrs. Stewart & Shearer, that in order to take advantage of the favorable opportunity for investment in the Security Markets, it would be wise to withdraw from your firm a substantial portion of the balance now remaining in my father's estate.

" Accordingly, will you kindly at your convenience, send me a check to the order of my Mother and myself as Executors for say $300,000, if that will leave with you sufficient on hand to cover any adjustments yet to be made in your office.

> " Very truly yours,
> " ALEXANDER D. B. PRATT
> " *Executor.*"

The letter indicates that the executors of the estate had been advised of the balancing of Pratt's account and that it was desired to withdraw practically all of the unpaid balance, with the exception of some $24,000, which it was thought might possibly be needed to cover minor adjustments.

On January 6, 1930, Stewart & Shearer, attorneys for the executors of Dallas B. Pratt, received from Maitland, Coppell & Co., a memorandum as follows:

"To
Messrs. Stewart & Shearer,
45 Wall Street,
 New York

From
Maitland, Coppell & Co.
62 William Street,
New York, January 6, 1930.

Attention of Mr. Richards.
 "*Estate of Dallas B. Pratt*

"We herewith enclose the Account Current Book of this Estate balanced as of December 31, 1929, receipt of which please acknowledge on the accompanying form.

 "MAITLAND, COPPELL & CO."

Accompanying the memorandum was the "Dallas B. Pratt" book of account which showed that after having been balanced on October 9, 1929, no other partnership transactions were recorded. The various debits and credits entered between October tenth and December thirty-first related to personal withdrawals and to credits of sums received on Pratt's individual securities.

These circumstances establish that an adjustment of Pratt's interest was arrived at between the executors and the surviving partners which is binding upon the parties in the absence of fraud or mistake, neither of which is claimed. (*Sage* v. *Woodin, supra.*)

*An Account Was Stated Between the Parties.*— Whether or not there was a settlement of the partnership affairs, the submission by the surviving partners to the executors of Pratt's account and their failure to object to the statement as submitted constituted an account stated. The parties stipulated that the amount paid by Maitland, Coppell & Co. to Pratt's executors was "the amount stated by Maitland, Coppell & Co. to be the credit amount which the estate was entitled to receive from the firm."

On the part of the executors, it was stipulated that "on examination the executors adopted, without dispute, the amount stated by the firm to be correct and accepted payment accordingly."

Plaintiff says that an account was not stated because "it could not be claimed that by retaining the book without objecting, the executors agreed to accept the amount of that credit balance in full of what they were entitled to receive out of the partnership liquidation." The argument assumes that liquidation was intended whereas the proof establishes the contrary. The surviving partners continued the business and neither they nor the executors contemplated liquidation.

An account stated is "nothing more or less than a contract express or implied between the parties. It is an agreement which they have come to, regarding the amount due on past transactions." (*Rodkinson* v. *Haecker*, 248 N. Y. 480, 484 [1928]; *Corr* v. *Hoffman*, 256 id. 254 [1931].)

*Hughes* v. *Smither* (23 App. Div. 590 [1st Dept. 1897]), relied on by plaintiff, held that failure of one partner to object to a statement of the partnership accounts submitted by the other partner did not constitute an acceptance of the statement, since "both parties naturally understand that the account as rendered is tentative." (BARRETT, J., at p. 595.) Unlike the instant case, no payment was made pursuant to the account.

It cannot be seriously argued, in the instant case, that an account, pursuant to which $424,394.11 was actually paid, was intended to be merely tentative.

Plaintiff suggests, without citing any supporting authority, that an account stated cannot be had in the absence of a controversy and the settlement of the dispute by compromise. The contention is clearly inconsistent with the general rule that an account stated simply represents an agreement between the parties of an amount due, based upon computation. Section 422 (comment b) of the Restatement of the Law of Contracts reads: "The validity of an account stated does not depend upon any uncertainty as to the existence or amount of the antecedent claims since the stated sum is supposed to be fixed, primarily, by way of computation, rather than compromise."

*The Payments Were Voluntarily Made.*— Apart from the foregoing considerations, plaintiff is barred from recovering under the doctrine that payment of a debt, voluntarily made, may not be recovered for a mistake of law.

In *Newburgh Savings Bank* v. *Town of Woodbury* (173 N. Y. 55 [1903]) the court, per O'BRIEN, J., said (at pp. 60, 61): "Without referring to the numerous authorities cited from other jurisdictions, or attempting to explain them, it is quite sufficient to say that the rule in this State from the earliest times to the present day has been consistent and uniform in favor of the general rule that money paid under a mistake of law cannot be recovered back. In the early case of *Shotwell* v. *Murray* (1 Johns. Ch. 512) Chancellor KENT stated the principle in the following terms: 'A person cannot be permitted to disavow or avoid the operation of an agreement entered into with a full knowledge of the facts on the ground of ignorance of the legal consequences which flow from those facts. I assume that this is a settled principle of law and sound policy.

* * * Every man is to be charged with knowledge of the law.' * * * The courts do not undertake to relieve parties from their acts and deeds fairly done on a full knowledge of facts though under a mistake of law. Every man is to be charged at his peril with a knowledge of the law. There is no other principle which is safe and practicable in the common intercourse of mankind."

The justification which this rule has in expediency and the due administration of justice is illustrated by the facts of the case at bar, where the estate has long been settled and distributed.

In *New York City Employees Retirement System* v. *Eliot* (242 App. Div. 396 [1st Dept. 1934]) the court said, per UNTERMYER, J. (at p. 399): " The plaintiff did not pay the allowances under any mistake of fact. It paid under a misconception of the law, and for such payments it was not entitled to recover. * * * The peace of society requires that voluntary payments made upon a claim of right, with full knowledge of all material facts, shall not be rescinded because at some time thereafter it is found that a different rule of law applies."

In *Payne* v. *Witherbee, Sherman & Co.* (200 N. Y. 572 [1911]) the court said, per COLLIN, J. (at p. 576): " The doctrine is well settled, in this country that a voluntary payment, where there is no mistake of fact although made under a mistake, cannot be revoked. * * * The fact that defendant paid the excess by mistake did not entitle it to a recovery."

The plaintiff apparently does not dispute the force of this authority, but argues that the payments were not voluntarily made, since Church's consent was not obtained.

It is not denied that Church had access to the firm's books. There is no question but that he could have ascertained the facts concerning the payments made on December 13, 1929.

Dealing with a similar situation, the Court of Appeals, in *Flour City National Bank* v. *Widener* (163 N. Y. 276 [1900]) said, per BARTLETT, J. (at p. 279):

" Where a member of a firm has access to its books of account he is presumed to know their contents (*Fairchild* v. *Fairchild*, 64 N. Y. 471, 480; *Hotopp* v. *Huber*, 160 N. Y. 524, 530) * * *.

" The fact that Widener was engaged in another occupation and saw fit to allow Smith to manage the business, does not in any way change his legal position toward the plaintiff. Widener admits that he occasionally called at the place of business and talked with his partner as to matters in hand. As a general partner he had full access to the books of the firm, and is chargeable with whatever those books disclosed. If he had examined them he would have

ascertained the facts already detailed in regard to these discounts, and that being so, he is chargeable in law with whatever he would have discovered had he made the examination. He is, therefore, estopped to deny that these transactions were with his knowledge or consent."

The debt was an obligation of the new firm. Its payment was binding upon all the partners.

In *Bulger* v. *Rosa* (119 N. Y. 459 [1890]) the court said, per ANDREWS, J. (at p. 467): " one partner may transfer the partnership effects directly to a creditor of the firm in payment of a debt without the knowledge or consent of his co-partner."

Subdivision 1 of section 20 of the Partnership Law, dealing with the authority of individual partners, provides, in part: " Every partner is an agent of the partnership for the purpose of its business and the act of every partner * * * for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership."

Plaintiff argues that the payment of the sum due to Pratt does not involve the carrying on of the business of the partnership in the usual way; that the " usual way " would be to liquidate the assets of the partnership and thus ascertain the amount due to the estate. There is, however, nothing unusual in the payment of a credit balance due to the estate of a deceased partner, where the surviving partners contemplate a continuance of the business

Furthermore, it is to be observed that the quoted provision of the Partnership Law refers to the " apparent " carrying on of the partnership business. The provision incorporates the common-law rules dealing with the acts performed by an agent without actual authority but under circumstances which justify third parties in relying upon an " apparent " agency.

In the instant case, the checks were signed by Maitland, Coppell & Co.; correspondence was had between the executors and the firm on the firm's stationery; Church was away in Texas, indicating no active interest in the business; the partners who were available were those formerly associated with Pratt and, therefore, those naturally to be relied upon in determining the manner in which Pratt's interest should be ascertained. All these circumstances justified the executors in assuming that the partners who were available had the requisite authority to bind the partnership.

*Plaintiff Barred by Laches.*— The payments to Pratt's estate were made in 1929. Church says he first learned of the payments in October, 1931, but did not think of bringing suit until July, 1932. There is no explanation why suit was not commenced before August,

1934. Pratt's estate was settled in September, 1932, and distribution of assets was effected. All the relevant information was available to Church from the beginning and could have been ascertained from the books or by inquiries of the firm's bookkeeper. Under all the circumstances, Church is in no position at this late date to appeal to equity for relief.

In *Seligson* v. *Weiss* (222 App. Div. 634 [1st Dept. 1928]) the court, per FINCH, J., said (at p. 638):

" In Pomeroy's Equitable Remedies (Vol. 1, § 21) the doctrine of laches is defined as follows: * * *

" ' Laches, in legal significance, is not mere delay, but delay that works a disadvantage to another. So long as parties are in the same condition, it matters little whether one presses a right promptly or slowly, within limits allowed by law; but when, knowing his rights, he takes no step to enforce them until the condition of the other party has, in good faith, become so changed that he cannot be restored to his former state, if the right be then enforced, delay becomes inequitable, and operates as an estoppel against the assertion of the right. The disadvantage may come from loss of evidence, change of title, intervention of equities, and other causes; but when a court sees negligence on one side and injury therefrom on the other it is a ground for denial of relief.' (Quotation from *Chase* v. *Chase*, 20 R. I. 202, per STINESS, J.)"

Church's failure to assert and prosecute his claim before August, 1934, during which time Pratt's estate was settled and distributed, indicates a lack of diligence that materially prejudiced the defendant's position.

It is the practice of courts of equity to deny relief where the petitioner has been guilty of unreasonable laches.

In *Calhoun* v. *Millard* (121 N. Y. 69 [1890]) the court, per ANDREWS, J., said (at p. 81): " It is and always has been the practice of courts of equity to remain inactive where a party seeking their interference has been guilty of unreasonable laches in making his application. (Story's Eq. Jur. § 1520.) The principle is stated with great force and clearness by Lord CAMDEN in *Smith* v. *Clay* (2 Ambl. 645): ' Nothing can call forth this court into activity but conscience, good faith and reasonable diligence. Where these are wanting the court is passive and does nothing. *Laches* and neglect are discountenanced and, therefore, from the beginning of this court, there was always a limitation to suits in this court.' "

*Hutchinson* v. *Sperry* (158 App. Div. 704 [1st Dept. 1913]), where the plaintiff partner sued for an accounting, involved a case in which the assets of the partnership had been transferred to a corporation which continued the business. Holding that the

plaintiff was barred by laches, the court said, per SCOTT, J. (at p. 708): " Since the corporation took over all the business and assets of the copartnership as a going concern, there was no occasion for a liquidation of the affairs of the copartnership, and no time need to have been allowed for such liquidation before plaintiff's right to demand an accounting accrued. And even if the Statute of Limitations were not strictly applicable we should be of the opinion that plaintiff by his long silence and acquiescence in all that was done by defendant upon the faith of the transfer and abandonment by plaintiff of all interest in the business, would amount to laches sufficient to justify a court of equity in refusing to grant relief, for an action of this character is essentially one of equitable cognizance both in form and substance. (*Calhoun* v. *Millard*, 121 N. Y. 69; *Rayner* v. *Pearsall*, 3 Johns, Ch. 578; *Ray* v. *Bogart*, 2 Johns. Cas. 432.) "

The extent of the delay which may be found to constitute laches is, of course, not measured by any particular period of time. Mr. Justice BROWN, in *Patterson* v. *Hewitt* (195 U. S. 309 [1904]) said (at p. 319):

" Indeed, in some cases the diligence required is measured by months rather than by years. *Pollard* v. *Clayton*, 1 Kay & Johnson, 462; *Attwood* v. *Small*, 6 Clark & Finelly, 232.

" And in others a delay of two, three or four years has been held fatal. *Twin-Lick Oil Co.* v. *Marbury*, 91 U. S. 587; *Hayward* v. *National Bank*, 96 U. S. 611; *Holgate* v. *Eaton*, 116 U. S. 33; *Hagerman* v. *Bates*, 5 Colorado App. 391; *Graff* v. *Portland Co.*, 12 Colorado App. 106."

The defendants are entitled to judgment dismissing the complaint upon the merits, with costs. Submit findings and judgment in accordance herewith.