Fuchsberg, J.
(dissenting). Most respectfully, I suggest the result reached by the majority brooks legal and economic realty. In my view, it is premised on an unsound definition of what is a “return of capital”. Remove that erroneous assumption and the argument it advances collapses like a house of cards.
A few simple principles will point up my position. Essentially, the capital of a limited partnership, like that of a corporation, consists of the contributions subscribed or paid in, in the one case by its partners and in the other by its shareholders. The amounts for which either of these classes *579 of investors is committed fix the limits of their exposure to creditors. To be distinguished are general partners who, by law, aside from their formal capital contributions, are personally responsible for the debts of the partnership.
A limited partnership’s creditors, therefore, have no right to look to anything but the capital contributed to the partnership and the personal liability of the general partners. For a limited partner’s interest, like that of a corporate shareholder, is nothing more than an undivided interest or, better yet, equity in the res of the partnership or corporation. That equity, subordinate of course to claims of general creditors, is a thing apart from the contribution of capital that gave rise to it. It therefore is basic that a sale or other transfer of that equity, so long as it does not directly or indirectly involve a withdrawal or impairment of the partnership capital itself, is, in fact as in form, not a return of capital, but merely the substitution of one owner of the limited partnership interest for another. It can be likened to a sale of corporate stock for a consideration which passes between the purchaser and seller of the shares in question; the corporation is no richer or poorer for the transaction.
Ignoring these basic tenets, the plaintiff in this now 12-year-old litigation hypothesizes that the defendants and the host of other limited members of the partnership in this case were participants in a plan whose purpose and effect was to put the capital of the partnership beyond the reach of creditors.[1] One trouble with the theory so postulated is that to carry it forward the plaintiff must soft-pedal the fact that the return of capital contemplated by subdivision (4) of section 106 of our Partnership Law speaks only of paid-in or subscribed partnership capital that is part of an investor’s “contribution”. The statute expressly limits any liability to such return of capital and not, as here, the consideration which owners of limited partnerships may have received for the sale of their limited partnerships from others than the partnership entity or its general partners, the only *580 ones on whose credit those who deal with a partnership have a right to rely.
As revealed by the record, the simple and undisputed fact is that the partnership capital in this instance was as unimpaired and as fully available to creditors after the defem dants sold their limited partnerships as it had been before they did so.[2] In particular, the defendants, neither directly nor indirectly, nor in whole nor in part, received any consideration for their interests from the partnership or its general partners. Accordingly, there was no diminution of the assets of those who were the sole potential sources of satisfaction of any existing or future partnership obligations. To now foist personal responsibility on the limited partners for once again the amounts of their original contributions is, therefore, to ignore the fact that the form of their investments was intended by law to secure them, inter alia, precisely against such vulnerability. Moreover,, it would provide plaintiff with an economic windfall by way of additional debtors for whose personal liability he did not bargain. Perhaps most important, this misapplication of equitable creditors’ action principles bids fair to undermine the continued vitality of the limited partnership as a legislatively sanctioned device for conservative investment of capital.
Closer examination of the circumstances of the transfer of defendants’ interests confirms these propositions. It is not disputed that the appellants played no role initiating, negotiating or making the agreement under which the general partners, in June, 1968, agreed on their own to sell their interest, which included the right to manage the partnership, to Black Watch Farms, Inc. (INC), subsidiary of Bermec. Perhaps to meet the strictures of Federal securities laws (see, e.g., Perlman v Feldmann, 219 F2d 173; Ferraioli v Cantor, 281 F Supp 354), Bermec also undertook to offer cash or Bermec stock (the choice to rest with Ber *581 mec) to each of the nonmanagerial limited partners for their individual partnership interests. But the agreement was not conditioned on whether any or all of such offers were accepted. Self-standing, it was completely independent of whether the limited partners, each acting on his own, decided to sell.
Moreover, the general partners, who controlled the partnership’s assets but not the limited partners’ discrete right to dispose of their own unrealized equity in the partnership, were without power to compel the appellants to agree to sell, if and when Bermec made the offer. In fact, the offer was not made until sometime after the underlying agreement had been entered into, at which time, not surprisingly in light of the passive place of the limited partners,[3] the defendants, on their own volition, decided to sell their limited partnership shares.[4]
[5]In any event, the net effect of the acceptance by each limited partner of a certificate of Bermec stock in place of a certificate of limited partnership was not to diminish the capital of the Black Watch enterprise or of its general partners. Indeed, not one cent’s worth of Black Watch Farms’ money or any of its other assets was paid to the plaintiffs. Instead, the value of Black Watch Farms’ assets, which on June 30, 1968 were valued at $25,863,527, by June 30,1969, well after the plaintiffs were no longer partners, had increased to $42,155,642.®
On policy grounds, it also is relevant that this good faith *582 transfer of limited partnership shares was nothing more than the exercise of another privilege which limited partners enjoy in common with corporate stockholders — the free transferability of interests (see Lichtyger v Franchard Cory., 18 NY2d 528, 536; Ruzicka v Rager, 305 NY 191, 197-198; Partnership Law, §§ 107, 108, subd [1]; Note, Sale of Limited Partnership Interests: Rivlin v. Levine, 14 Hastings LJ 176). No doubt this privilege is one of the chief reasons the limited partnership holds a favored position as a form of investment (see Haft and Fass, Tax Sheltered Investments, 4 Securities Law Series [rev ed, 1979], §§ 1.02, 5.02[2]).
Furthermore, the provision for the “return in whole or in part of the capital of his [limited partner’s] contribution” (Partnership Law, §§ 105, 106, subd [4]) does not look to the assets of the limited partner, but to those of the partnership and its general partners. It is illuminating, therefore, on examination of cases in which limited partners have been held to have received a return of capital, that each involved a dimunition of the capital of the partnership or a general partner.
For example, the Kittredge case, whatever its nostrums, was one in which a special partner was sued for the investment which had been returned to him out of partnership capital by two general partners in the course of dissolving the partnership (Kittredge v Langley, 252 NY 405, 408-409). Without question what was involved there was a “return of capital”.
In the same direction is Beers v Reynolds (11 NY 97). There the sale of a limited partner’s interest was to a general partner, who, in securing payment of the purchase *583 price, gave the limited partner a chattel mortgage on both the partnership property and that of the general partner. Without more, at least in this circumstance, the mortgage was in effect the equivalent of a capital distribution in kind. Similarly, in Madison County Bank v Gould (5 Hill 309), title to partnership property was taken in the name of limited partners.
So, too, in Neal v United States (195 F2d 336) a general partner used cash obtained from third parties as well as his own personal assets and his own promissory notes to buy out his limited partners, a classic diminution of a creditor’s security. In like manner, in Johns v Jaeb (518 SW2d 857 [Tex]), a general partner undertook an unconditional personal obligation to purchase the interest of a limited partner ; again, we have a substantive, if not a formal, variant on the prohibited pattern of a payout of a limited partner at the expense of the security afforded creditors by the partnership-general partner nexus. In sharp contrast to either of these cases, in the present one the two former general partners did not pay the defendants anything via their own assets or those of the partnership.
Now turning back to the case at issue, unless an unwarranted cynicism is to govern — and there is not even a whisper of fraud, sharp dealing or preferential, intention — the defendants’ election to accept Bermec’s arm’s length offer to pay for the purchase of their limited partnerships in non-partnership and nonpartner assets did not run afoul of our statutory law. Having resorted to neither partnership nor general partners’ assets, how they disposed of their equity was their own affair.
Though the corporate stock the limited partners received ultimately became worthless, whether it represented an appreciation or depreciation of their investments at the time it was received was immaterial.[6] The sale in no way affected the quantum of the partnership’s or general partners’ capital. The shares of Bermec stock for which the limited'part *584 nerships were exchanged were not, and never had been, an asset of the partnership and therefore in no way were, or had been, available to discharge partnership obligations (see Mason, Fundamentals of Accounting, p 329). The substitution of new limited partners for the old ones had no bearing on a creditor circumstanced as was the plaintiff. The capital represented by each limited partnership remained intact.
Overall, the legitimate interest of a creditor is that the capital of a partnership shall be honestly represented and fully contributed and maintained as such. The defendants engaged in no acts constituting a departure from these requirements. Consequently, there is no more justification for imposing the respondent’s losses on the defendants than there would be for imposing those suffered by the plaintiff on the defendants.[7]
Finally, so far as collateral estoppel is concerned, I agree that as a general rule limited partners are bound by adjudications against a limited partnership, but only to the extent of the assets which they agreed to contribute. Estoppel therefore turns on whether the assets being pursued are those of the partnership. Since, for the reasons stated, the stock which the limited partners accepted for their partnership interests were not partnership assets, collateral estoppel does not not apply.
For all these reasons, I would reverse the order of the Appellate Division and reinstate the judgment at nisi prius.
Judges Jasen, Jones and Sweeney* concur with Judge Meyer; Judge Gabrielli dissents and votes to reverse and remit the case for further proceedings in a separate opinion in which Chief Judge Cooke concurs; Judge Fuchsberg dissents and votes to reverse and reinstate the judgment of Supreme Court in a separate dissenting opinion.
Order affirmed.

. It is ironic that plaintiff’s underlying claim against the partnership was for a brokerage fee, presumably for his efforts to produce a deal akin to the one on which he now seeks to advantage himself.

. It has been authoritatively stated that, in the context of a partnership, capital means “the aggregate of the sums contributed by its members for the purpose of commencing or carrying on the partnership business, and intended to be risked by them in that business” (3 Lindley, Partnership [8th ed], p 382, quoted in M. & C. Creditors Corp. v Pratt, 172 Misc 695, 715, affd without opn 255 App Div 838, affd without opn 281 NY 804).

. Limited partners typically have less say over management than do corporate shareholders. They lack even the shareholders’ right to vote for a change in management. Rather, they can only inspect the firm’s books and, if warranted, force a judicial dissolution and account (Partnership Law, § 99).

. Since the option to pay in the form of Bermec stock or at the rate of $118,000 in cash for each $10,000 limited partnership interest rested with Bermec alone, the size of the cash payment, except for its impressive sound, was illusory. It could just as well have been 118 million instead of 118 thousand. As indicated, Bermec was not required to offer any cash and it never did. It appears obvious then that the function of the $118,000 was purely cosmetic, a dangling of a fictitious dollar value in order to induce the limited partners to sell. Thus, while the limited partners may have been the victims of high pressure sales tactics, possibly the “sheep” that were to be shorn, by not the wildest stretch of the imagination can it be said that they were engaged in a plot to divide the capital of the partnership.

. If anything, the assets available to creditors were enlarged. As the record indicates, when the newly formed INC took over the unimpaired partnership *582 assets, it also assumed its liabilities, so that creditors became the obligees of both INC and the partnership rather than the partnership alone. While the plaintiff was not included on the list of partnership liabilities contained in the agreement between INC and the partnership, that was no doubt due to the fact that the managers of the partnership did not believe that the plaintiff, who did not commence his action against the partnership until two months later, was a creditor. Regardless of whether, under these circumstances, the plaintiff would have been treated like other creditors under the INC-BWF agreement (an academic matter in view of the fact that INC and BWF had both become insolvent by the time the plaintiff procured his eventual judgment against the partnership some eight years later), the creditors were certainly no worse off.

. Any gain or loss produced by such a sale, since it is the product of an asset of the partner rather than of the partnership, would be debited or credited for tax purposes to the limited partner alone (US Code, tit 26, § 741; Kinney v United States, 228 F Supp 656, affd 358 F2d 738).

. As a result of what, for aught that appears, were but the financial vicissitudes of private enterprise, the partnership, INC and Bermec each was to suffer insolvency in subsequent years. Concomitantly, the Bermec stock the limited partners received as consideration for their partnership interest became worthless.