MAUDELLA M. CAHILL, as Executrix of WILLIAM P. W.
HAFF, Deceased, Respondent, v. HARMON B. W. HAFF,
Appellant.

Partnership — accounting — surviving partner may be
required to account — representatives of deceased partner
entitled to profits attributable to continued use of assets of
estate in the business — either party to partnership may
repudiate it at any time — partnership between father and son
under agreement that on death of father business should be
continued by his estate and the son — partnership terminated
on death of father where by his last will he had destroyed pro-
visions for continuance of business — partnership also termi-
nated by refusal of son to continue business for benefit of
estate — son charged only with duties of surviving partner
— must account for firm transactions during period there
had been no accounting between partners — also for period
after father's death during which existing contracts were
completed and assets collected — also for profits attribu-
table to use of capital belonging to father's estate in business
thereafter continued by son — father not chargeable with bad
accounts turned over by him as part of capital on admitting
son to partnership — not chargeable with sums drawn by him
unless shown that amounts were for his personal ends — son
entitled to reasonable compensation for winding up firm —
cost of audit and litigation proper firm expenses.

1. A surviving partner may be required to account for the firm
transactions and for transactions requisite to wind up the firm business
and if he continues the partnership business, with no accounting,
retaining and using therein capital belonging to the estate of the
deceased partner with the consent, express or implied of his repre-
sentatives, the latter are entitled at their option to receive the profits
attributable to the use of his rights in the property of the dissolved
partnership.

2. Notwithstanding a provision in a partnership agreement for
notice of intention to terminate the relation, either party may repu-
diate it at any time. No one can be forced to continue as partner
against his will though he may be liable for breach of contract.

3. Where a father admitted his son to partnership and agreed in
writing that in the event of his death his capital should remain in the
business, which should be carried on by the son and his estate, and on

the same day made a will with similar provisions, naming his wife and the son as executors, but thereafter made another will destroying the provisions of the earlier one and the agreement as to the continuance of the business, the partnership terminated upon the death of the father and upon the son was imposed only the duties of a surviving partner.

4. Even assuming the provisions of the earlier will to be still in force, the partnership was terminated where, after his father's death, the son wrote to a trustee under the will of his father, who was attorney for the executrix, plainly indicating that he would not continue the business for the benefit of the estate. All the son may be required to do, therefore, is to fulfill his obligations as a partner during his father's life and as a surviving partner after his death.

5. Where it appears that during the existence of the original firm there had been no accounting between the parties, the executrix is entitled to an accounting of the firm transactions during that period, and where the son, after his father's death, took control of the business completing all contracts and collecting assets, so far as possible, until the end of the business year, he should account for these transactions, charging himself with one-half the value of uncollected assets. And if the father at the date of his death had any capital in the firm, which remained there with the implied consent of the executors and trustees and was used in the business, the executrix is entitled to receive the profits attributable to the use of this capital and for it also the son must account at least to the date of any new trial.

6. Where the books of the business at the time the son was admitted to partnership showed that certain customers were heavily indebted to the father and a few years later more than half of this indebtedness was charged off by the firm, which reported it as a deduction in its income tax report for that year and it appears that on taking his son into partnership the father contributed, as the only capital of the new firm, " the capital and moneys that shall stand to his credit on the books of the present firm," a contention that the entire loss should be charged to him cannot be sustained. There was no guaranty that the accounts standing on those books were valid and it must be held that the son took all accounts " as is."

7. It appearing that large sums of money were drawn from the business by the father in his lifetime, it was properly held on an accounting between his estate and his son, as surviving partner, that it was for the son to show that the amounts were not used for business purposes, where from the evidence a presumption was warranted that many of the amounts drawn were so used and the son, having the principal management of the business, must have known what was the truth.

8. The referee properly disallowed the claim of the son for salary at the rate of $50,000 a year. He is entitled, however, to reasonable compensation for winding up the affairs of the firm.

9. The cost of an audit and expense of certain litigation were proper firm expenses.

*Cahill* v. *Haff*, 222 App. Div. 764, reversed.

(Argued May 3, 1928; decided June 5, 1928.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the second judicial department, entered January 10, 1928, modifying and affirming as modified a judgment in favor of plaintiff entered upon the report of a referee.

*Abel E. Blackmar* and *Pierre M. Brown* for appellant. One-half of the sum lost by the plaintiff's testator in his own business before the partnership was formed was improperly charged to defendant. (*Boyd* v. *Foot*, 5 Bosw. 110; *Schulte* v. *Anderson*, 13 J. & S. 489; Partnership Law, § 40, subd. 1, § 71; *Livingston* v. *Blanchard*, 130 Mass. 341.) The court erred in holding that the defendant had the burden of proving that an amount drawn from the business by decedent during his lifetime was not used for business purposes. (Rowley's Modern Law of Partnership, § 729; Bates on Partnership, § 765; *Sweatt* v. *Johnson*, 97 Vt. 177; *Webb* v. *Fordyce*, 55 Iowa, 11; *Laswell* v. *Robbins*, 39 Ill. 209; *Johnson* v. *Garrett*, 23 Minn. 565; *Costa* v. *Costa*, 222 Mass. 280.) The defendant is entitled to reasonable compensation for his services in carrying on the business since the death of plaintiff's testator. (Story on Partnership [7th ed.], § 343; *Meyer* v. *Meyer*, 201 App. Div. 596; *Ongley* v. *Marcin*, 214 App. Div. 455; *McGibbon* v. *Tarbox*, 144 App. Div. 837; *Griggs* v. *Clark*, 23 Cal. 427; *Robinson* v. *Simmons*, 146 Mass. 167; *Condon* v. *Callahan*, 115 Tenn. 285; *Willett* v. *Blanford*, 1 Hare, 253; *Brown* v. *De Tastet*, Jacob's Rep. 284; *Moore* v. *Rawson*, 185 Mass. 264.) The court erred

in not stating the accounts so as to show each partner's capital account and computing interest thereon in accordance with the partnership articles. . (*Masters* v. *Brooks*, 132 App. Div. 874; *Caldwell* v. *Leiber*, 7 Paige, 483; *Burke* v. *Fuller*, 41 La. Ann. 740.)

*Henry M. Earle* for respondent.

ANDREWS, J.  Before 1913, William P. W. Haff was engaged in the wholesale coal business. In that year Harmon B. W. Haff, a son, became his partner. The father died in 1919. Until that date the partnership continued. It is clear that the surviving partner may be required to account for the firm transactions and for transactions requisite to wind up the firm business. That at least he must do. Whether he must do more depends upon the agreement made between father and son in 1913, and upon various other considerations. If the son, for example, continues the partnership business, with no accounting, retaining and using therein capital belonging to the estate of the father, with the consent express or implied of his representatives, the latter are entitled at their option to receive the profits attributable to the use of his rights in the property of the dissolved partnership. (Partnership Law (Cons. Laws, ch. 39), sec. 73 — merely a statement of the pre-existing law; Pollock on Partnership, p. 133.)  Probably the same thing is true if there be no consent.

Conceding that there should be an accounting in this case, the first question for us to consider is its extent. In other words, between what dates is it to be required?

As we have said, the partnership agreement was executed in 1913. It is a long document. The father admits the son to partnership in an existing business. The partnership is to begin on September 17, 1913, and to continue until sixty days after notice in writing of dissolution given by one party to the other. The capital consisting

of " the capital and moneys standing to his credit " on the books of the business was to be contributed by Haff, Sr., but Haff, Jr., was to contribute thereto all of his share of the profits exceeding $5,200 annually. Upon dissolution the son was to receive the amount so contributed by him, and the father the balance, and " the business." At no time and under no circumstances is good will to be considered an asset. Profits and losses are to be shared equally. Upon the death of Haff, Sr., " his entire interest in the firm shall be disposed of in accordance with the provisions of his last will and testament read in connection with this agreement." This collateral agreement is not important. If he subsequently changed his will, as happened, the son's remedy, if he has one, is an independent proceeding. Another provision, however, is more material. " In the event," it says, of the death of Haff, Sr., the capital and moneys standing at that time to his credit upon the books of said firm shall remain in the business, which shall be conducted by the son " and the estate " of the father " equally, as provided in the will of " the father " to which reference is hereby made." The son " shall then be and become entitled in his own right to one-half of the joint capital of said firm   *   *   *   and to one-half of the profits from the date of such death and the estate " of the father " shall be entitled to the other half of said capital and the other half of said profits." Again any " partnership " between son and estate may be terminated on sixty days' notice and either son or estate may liquidate the partnership. A will, so referred to and made a part of the agreement in so far as it refers to the conduct of the business after the father's death, was executed the same day. Its provisions are not unlike the agreement. The son is to have half the assets and capital of the firm. The executors — the son and testator's wife — are to be guided by the agreement as to the conduct of the business. The intent of the testator is that his estate and his son shall be

equal partners in the business which shall be continued as long " as it shall be advisable and profitable," and " shall share equally in profits and losses." But he directs his son to defer to the wishes of his wife " on any question connected with the management of the estate, it being my intention that her desires and judgment shall control as to the interest of my estate in said business."

So the partnership started off. Under the agreement it could be terminated upon sixty days' written notice. After the death of Haff, Sr., the arrangement, whatever it was, could be ended in sixty days by any notice. Notwithstanding this clause, however, either party might repudiate it at any time. Then it ended. No agreement can prevent this result. No one can be forced to continue as partner against his will. He may be liable for breach of contract. Nothing more. (Partnership Law, sec. 62.) Or the court may decree a dissolution where one partner has willfully and persistently breached the partnership agreement. (Sec. 63.) In the absence of such a decree, however, where one partner, in violation of the agreement, has ended the partnership, material violation of the agreement by the other would be a defense were damages asked of the former for breach of contract.

For some years the business continued without dispute. In 1917, however, when trouble between father and son seems to have arisen, Haff, Sr., revoked his will of 1913, and made a new one. By it he bequeathed his property " including my interest in the coal business " to trustees for the benefit of life tenants and remaindermen named therein. He authorizes the trustees also to sell or exchange any of the property held in trust. This must include " my interest in the coal business." The trustees named are a Mr. Brown and a Mr. Felton.

It is difficult to see why this does not destroy the provisions of the earlier will and the agreement as to the continuance of the business after the death of Haff, Sr.

They contemplated its continuance under the direction of the son individually, and the son and the wife as executors, until a sixty days' notice given by the son or by the executors at the request of the wife — the son and the executors having each a half interest. Now a half interest passes to trustees. They have no authority to continue the business. What they get is " my interest in the coal business "— Mr. Haff's equity in capital and profits. It is their duty to liquidate it promptly. It would seem that under these circumstances the arrangement as to what was to happen after Mr. Haff's death was ended. It was that the business was to be continued under the control of the son and the executors. We need not determine the relation of the parties had it been done. As the trial court finds without objection, the original partnership ended when Mr. Haff died. He might have provided that the survivor retain his capital in and manage the business for a period. Doubtless then the amount so retained would be at the risk of the business, but the estate would be liable for nothing more. He and his son might also agree that at his death a new partnership should arise between his son and his executors and the business be conducted at the general risk of his estate. (*Stewart* v. *Robinson,* 115 N. Y. 328.) The first supposition is not borne out by the language used. Both the agreement and the will assume that the executors are to share in the control of the business. It is to be conducted by the son " and the estate " of the father " equally as provided in the will." The result is spoken of as " a partnership." In the will he charges his executors " in the conduct of the business to be guided entirely by the provisions of the partnership agreement," and he says one of them, his son, shall defer entirely to the wishes of the other, his wife, " it being my intention that her desires and judgment shall control as to the interest of my estate in the business."

At any rate, whatever legal results follow, it is clear

that the agreement of the parties was, not that the son, as sole survivor, should carry on the business for the benefit of himself and the estate, but that he and two persons named should do so. When by executing the second will Mr. Haff made this impossible the whole provision fell. If so the partnership terminated by the father's death. Upon the son were imposed only the ordinary duties of a surviving partner. As to this later will the son had no knowledge.

Passing this for the present, however, it appears that disputes continued. So in June, 1918, the father served on the son notice that he elected to terminate the partnership in sixty days. Negotiations followed. On August 30 the notice was withdrawn by mutual consent. The parties signed a new agreement, annexing and referring to the original contract, stating that there should be an audit of the firm's affairs and that when this was done they will make a new partnership contract for the future conduct of the business which shall provide that upon the death of Haff, Sr., the uncontrolled management of the business should be in the hands of Haff, Jr. This, however, because of the death of Haff, Sr., was never done. The whole matter, therefore, seems immaterial. The withdrawal of the notice of dissolution left the original contract in force until or unless it was superseded by the new contract which was contemplated.

The elder Haff died, as has been said, on February 22, 1919. Even assuming that the provisions of the will of 1913 were still in force the business was to be continued and controlled by Haff, Jr., individually and by him as executor and Mrs. Haff, the son's actions as executor to be under the direction of the latter. Haff and the executors were each entitled to one-half of capital and assets. Both were to continue the business for the benefit of the estate until the sixty days' notice was given. If the executors assented to the arrangement then, at least, they became partners. But whether so or not it

seems that either party could terminate the arrangement with or without the lapse of sixty days, subject to some claim for damages for breach of contract. And that the son did. On April 8, 1919, he wrote a letter to Mr. Earle, the attorney for the plaintiff. He says anything he sends Mrs. Haff, sole life beneficiary under the trust created by the later will, is a loan, " whether any one likes it or lumps it, notwithstanding she is the executrix." And he indicates plainly that he will not continue the business for the benefit of those claiming under the will. It is a clear denial that he has any obligation to go on for the benefit of the estate and a refusal to do so.

So we have reached the conclusion that all the defendant may be required to do is to fulfill his obligations as a partner during his father's life and as a surviving partner after his death.

The trial court has found and the findings have the support of some evidence that never during the existence of the original firm did the parties ever have any accounting. To that plaintiff is entitled. The son, after the father's death, took control of the business. That it was his duty to do. He completed the business of the partnership until the end of the coal year on March 31, 1919, finishing all contracts and collecting assets so far as possible. He has not accounted for these transactions. He should do so, charging himself with one-half the value of the uncollected assets. Finally, if the father at the date of his death had any capital in the firm, this capital remained there with at least the implied consent of the executors and trustees. It was used in the business. The executrix, therefore, at her election is entitled to receive the profits attributable to the use of this capital and for it also the son must account at least to the date of any new trial. At the time of his death, therefore, did the deceased have capital therein?

We are told that we may determine this question for ourselves upon the finding of the referee. If this be true, it is better to do so.

As appears by the referee's report, on February 22, 1919, the assets of the firm amounted to $265,160.90. Its liabilities were $241,076.25. The balance is $24,084.65. If this were all it would seem that the father at his death still had invested therein $12,042.33. It is said this result does not follow. The father it is claimed drew out all the capital contributed to the firm and so much more than one-half of the earnings that when he died the son was entitled to more than the balance of $24,000.

1. On the books of the business in 1913 when the partnership was formed five coal companies appear to have been indebted to Haff, Sr., in the total of $224,544.71. In 1917, of this indebtedness $105,915.85 was charged off by the firm; and the firm reported this sum as a deduction in the income tax report for that year — the year when the loss was determined. It is said the entire amount should be charged to Haff, Sr. If so, his entire interest in the assets would be wiped out.

We cannot see it in that light. In 1913, Mr. Haff, taking his son into partnership, contributed as the only capital of the new firm, " the capital and moneys that shall stand to his credit on the books of the present firm." That was no guaranty that the accounts standing on those books were valid. We think the son took all accounts " as is."

2. One hundred and forty-one thousand and fifty-eight dollars and twelve cents was drawn by Haff, Sr., from the business in his lifetime. If this whole amount should be charged to him again the $24,000 disappears. Whether it should be so charged depends upon the burden of proof. The referee held that it was for the defendant to show that the sum was not used for business purposes. The ruling may be sustained. It is to be remembered the question arises not between two members of a firm,

each presumptively acquainted with the details of the business, but between a surviving partner and those who have no such information.

The firm apparently, purely as a token of respect and affection, were accustomed to make large gifts to friends and acquaintances. The custom was continued by Haff, Jr., after his father's death. As a fortunate coincidence these friends happened to be in a position where they could influence purchases of coal by large corporations. Between 1913 and his death a large number of checks — aggregating $250,390.34 — were drawn by Haff, Sr., to his own order or to cash or in some similar form. Of this total, notation on the stub books showed that $109,332.22 was used by him personally. Nothing appears as to the balance of $141,058.12, except that they were made payable to " cash " or to " Ed. Moore " (a friend), or in some similar form. The totals ranged from $12,000 to $32,000 annually. Apparently Moore and the firm were engaged in kiting checks. Under the partnership contract, Haff, Sr., had the sole right to sign checks on the firm account. Much of the time, however, in the later years, he was ill and absent. On such occasions at least he left in the office checks signed in blank which were filled in as occasion arose. In fact he was never at the office after October, 1917, and only there irregularly in the early part of that year. Yet in 1917 there were checks of the class in dispute amounting to $31,000 and in 1918 $12,328.45. Some were drawn and cashed in California or Florida where Haff, Sr., was at the time. The referee said the defendant must show that these checks were not used in the firm business. " The character of the accounting is to be determined * * * by the interpretation placed upon the partnership agreement by the partners * * *," also because " Moore appears to have been an agent, used or employed in some form, in the transaction of the Haff business, and as such, he enters into the system and the burden is on the surviving

partner to separate the items which make up the personal from those which on their face seem to belong to the system." He adds that for years Haff, Sr., had made such a separation by notation on the stub books with the knowledge of the son. He evidently by leaving the other stubs blank was following the precept not to allow one hand to know what the other did.

We think the presumption in the present case is that a check on the firm account, payable to " cash " or to A, B or C was drawn for firm purposes. Especially in an accounting between a surviving partner and the estate of one deceased, and where the survivor knows, as Haff, Jr., must have known, having as he did the principal management of the business, what the truth was. We then come to a question of fact, which the referee has decided against the defendant.

Even more difficult is a subordinate detail of this subject. Forty thousand dollars of these $140,000 checks were drawn after January 1, 1917. It is said no objection was made to charging these to the father. This was not so originally. The objection was to charging against Haff, Sr., " a large amount of checks totalling over $100,000." But there is some concession made by the plaintiff. We think, however, the objection was never withdrawn and that the referee was correct in considering the whole subject.

Certain other questions arise, not touched upon in the appellant's brief, as to transactions before February 22, 1919. The referee properly disallowed the claim of the son for salary at the rate of $50,000 a year. He is entitled, however, to reasonable compensation for winding up the affairs of the firm. The cost of an audit agreed upon in August, 1918, is clearly a proper firm expense. So were the expenses of certain litigation with the Susquehanna Coal Company.

Then what are we to do with this judgment? The referee states that on February 22, 1919, the capital of

the firm was $24,084.65.   Where this came from we do not
know.   The original capital he says was...    $24,825 05
Earnings from boats....................    16,089 72
Earnings to February 22, 1919...........   116,851 14
Earnings to end of coal year, March 31...     7,473 40

    Total.............................    $166,239 31
Add to this various items, which perhaps
    should be so added..................    72,326 43
And subtracting certain items...........    10,035 98

                                 $62,290 45
We have a grand total of...............    228,529 76
From this subtract
Personal drawings of Haff,
    Sr.....................   $109,332 22
Bonds retained by him.....     91,778 42
                                      201,110 64

We find nowhere a statement as to what the son drew.
In 1916, apparently $24,126.70.   In 1917, $35,196.07.
The objections state that between 1913 and 1919 he drew
in addition to $5,200 a year, over $125,000.   The result
is so extraordinary, we are unwilling to attempt to state
an account showing whether or not Haff, Sr., had any
interest in this capital.   The defendant claims he owed the
firm over $60,000.   Perhaps he is right.   We do not know.

Therefore, the judgment must be reversed and a new
accounting had on the basis indicated.   (1) Haff, Jr., is
to account for the operations of the firm to March 31,
1919, the end of the coal year.   In that account Haff, Sr.,
is not to be charged individually either with the sum of
$105,915.85 of bad accounts turned over by him to the
firm or with the $141,058.12 of " cash " or " Moore "
checks unless evidence is produced that the same were
used for his personal ends.   If after March 31, trans-
actions occurred, attributable to the partnership, they
may also be considered.   (2) If it appears upon such

accounting that Haff, Sr., was entitled to the whole or any part of the remaining assets the amount to which he is so entitled shall be fixed. Haff, Jr., shall then account for the profits attributable to the use of such amount in the business conducted by the defendant unless the plaintiff prefers to accept interest thereon. Such an accounting is to be conducted on equitable principles. It is not a question of punishing the defendant. How important a part did such a sum as capital used in the business contribute to its success? How much of the profits resulted from the purely personal ability and action of the defendant? Such and similar questions are important. And if the business continues the accounting should be continued to the date of the trial.

As there is to be a new trial questions of costs and the expenses of the accounting may then be considered anew.

The judgment of the Appellate Division and the judgments of the Special Term should be reversed and a new trial granted, with costs to abide the event.

Cardozo, Ch. J., Crane, Lehman, Kellogg and O'Brien, JJ., concur; Pound, J., not sitting.

Judgments reversed, etc.