HAROLD J. ROSEN TRUST, Respondent-Appellant, v MAURICE L. ROSEN et al., as Surviving Partners Doing Business under the Name Rosen Brothers, Appellants-Respondents.

Fourth Department, July 12, 1976

*Hancock Estabrook, Ryan, Shove & Hust (Donald Kemple* of counsel), for appellants-respondents.

*Bond, Schoeneck & King (John Dee* and *Robert J. Hunt* of counsel), for respondent-appellant.

MOULE, J. The issues presented on this appeal involve the validity of an interlocutory judgment and certain subsequent intermediate orders made in connection with the dissolution of a partnership as well as the propriety of the final judgment determining plaintiff's share in the assets and profits of the business.

On October 1, 1958 plaintiff's decedent, Harold J. Rosen, and defendants, Herbert S. and Maurice L. Rosen, three brothers, formed a partnership with offices in Syracuse for the purpose of engaging "in the business of purchasing, selling, leasing and managing real estate and constructing buildings thereon." While all three partners initially made contributions to capital, they contemplated that Harold and Herbert,

who were both highly paid executives with the Helene Curtis Cosmetic Co., Inc., would contribute the necessary money to operate the business and that Maurice, a licensed real estate broker, would be responsible for managing the partnership.

To reflect this arrangement, the partnership agreement provided that net profits or net losses would be divided equally even though one partner's capital or income account might be considerably greater than another's and that no partner would receive any salary for services rendered to the partnership. It further provided that, upon the death of a partner, the partnership would not terminate but rather would continue under the management of the surviving brothers. The deceased partner's legal representative could participate in the profits and losses of the business or, at his option and with notice to the surviving partners, he could elect to withdraw. If such election was made, the surviving partners were required either to purchase the deceased partner's interest or else to terminate the business with reasonable promptness. In any event, however, the agreement provided that no compensation would be paid to the surviving partners for their services in liquidation of the partnership.

Throughout the next six years, the partnership either purchased or leased six pieces of income-producing real estate, four of which were located in Syracuse, one in Buffalo and one in Skokie, Illinois. Office buildings were constructed on these properties and the premises were then leased to various tenants.

Thereafter, on August 24, 1964 Harold J. Rosen died and, pursuant to the terms of the partnership agreement, his estate notified defendants on November 8, 1964 that it intended to withdraw from the partnership as of December 31 of that year. Herbert and Maurice did not purchase the estate's share of the business and, in accordance with article 11 of the partnership agreement, they were under a duty to liquidate the business promptly and to distribute the assets.

On October 9, 1967 plaintiff commenced an action alleging, *inter alia,* that defendants had breached their fiduciary duties in failing to liquidate and distribute the assets of the partnership with reasonable promptness; that Maurice Rosen had received management fees and leasing commissions in violation of the partnership agreement; and that the estate was entitled to the return of $50,000 which Harold Rosen had deposited with the partnership prior to his death. On the basis

of these allegations, plaintiff sought a judicial dissolution of the partnership, an accounting, the appointment of a receiver, liquidation and distribution of the partnership assets, and a separate recovery of the $50,000 deposit.

Although this action was commenced in 1967, it did not come to trial until April, 1970. Prior to the start of the trial, plaintiff and defendants stipulated that an independent valuation of the partnership properties should be undertaken and designated Harvey Jeffers to appraise four of the partnership properties and James Foley to appraise another. These appraisals are hereinafter designated as the "Jeffers appraisal". The Jeffers appraisal, according to defendants, was designed to assist the parties in possible settlement negotiations but, inasmuch as it was completed just prior to the trial, no settlement was reached and the case was presented to the court.

Thereafter, in an interlocutory judgment entered on October 8, 1970, the court made the following determinations:

1. That the partnership was legally dissolved as of December 31, 1964;

2. That the "extraordinarily lengthy delay" in liquidating the partnership constituted a breach of defendants' fiduciary duties and necessitated an accounting;

3. That defendants were required to submit an accounting within 60 days of the entry of the judgment to establish plaintiff's share in the assets as of December 31, 1964 as well as its share in post-dissolution profits up to the entry of the judgment;

4. That the payment of leasing commissions and management fees, except those management fees paid prior to Harold Rosen's death, constituted a violation of the partnership agreement;

5. That plaintiff had failed to establish its exclusive right to the $50,000, and

6. That, upon submission of the accounting, plaintiff could elect to receive a one-third interest in the partnership assets valued as of December 31, 1964 either with interest on that amount up to the date of the entry of judgment or with one third of the post-dissolution profits up to the same date. In lieu of electing the 1964 valuation of the assets, plaintiff could alternately elect to take a one-third share in the partnership assets valued as of the date of the entry of judgment.

Defendants subsequently failed to submit their accounting within the specified 60-day period and, in a letter to the court dated December 11, 1970, plaintiff requested an order permitting it instead of defendants to prepare and file an accounting. The court declined to grant this order immediately and, in its discretion, granted defendants an extension until January 4, 1971. Defendants, however, failed to submit their accounting before the expiration of the extension and, on January 11, 1971, the court issued a supplementary order in which it foreclosed defendants from submitting an accounting, permitted plaintiff to do so instead, and assessed attorneys' and accountants' fees against defendants. Defendants subsequently appealed from this order.

While the appeal was pending, however, plaintiff submitted its accounting in which its share of the partnership was valued at $429,180.71. Thereafter, on May 6, 1971 plaintiff moved for confirmation of its accounting and for recovery of its specified share from defendants. Plaintiff also sought various fees and expenses as well as the right to retain the option of receiving a share in net worth of the partnership as of the date of the interlocutory judgment.

This motion was heard by Special Term on May 18, 1971 and on October 20, 1971 it entered an order declining to confirm plaintiff's accounting. Instead the court directed that all contested matters in the account should be submitted to a referee. However, it also held that, inasmuch as plaintiff's accounting relied primarily upon the Jeffers appraisal which was prepared before the original trial of this action and, inasmuch as defendants had previously stipulated to the preparation of that appraisal, plaintiff's computations as to the fair market values of the partnership assets would be binding on the parties in the trial before the referee. Defendants also appealed from this order.

Prior to the submission of this case to the referee, defendants' appeals from this order and from the supplementary order of January 11, 1971 were heard and decided by this court. In a unanimous decision made February 25, 1972 (Rosen v Rosen, 38 AD2d 881) we ruled that the motion requesting that defendants be foreclosed from submitting an accounting and that plaintiff be permitted to submit an accounting instead failed to conform to the notice requirements of CPLR 2214 and that the resulting supplementary order of January 11, 1971 must be reversed. Since there was, therefore, no legal

authorization for plaintiff's submission of an accounting, the subsequent order of October 20, 1971 which referred the accounting to a referee was held to be a "nullity". Accordingly, we denied plaintiff's motion to foreclose, thus permitting defendants to submit their own accounting as originally directed in the interlocutory judgment, setting forth the value of the partnership assets as of December 31, 1964 as well as the profits of the partnership inclusive from 1965 to 1970. Inasmuch as this decision nullified Special Term's order that the previous appraisals would be controlling, the issue of the fair market value of the partnership assets was again opened to litigation.

Thereafter, on March 9, 1972 defendants submitted their accounting. Prior to the service of its objections plaintiff moved to compel defendants also to submit an accounting for 1971, including the production of income statements and tax returns for that year. Additionally, plaintiff sought the appointment of a receiver and the immediate payment of a part of its claim. Defendants, in turn, cross-moved for confirmation of their accounting or, in the alternative, for an order requiring plaintiff to elect a recovery option and to produce the estate tax returns in which the value of Harold Rosen's share in the partnership had been set forth.

These motions were argued on June 27, 1972. In an order entered on December 28, 1972 the court granted plaintiff's motion with respect to the 1971 supplemental accounting and defendants' motion for the production of estate tax returns. It denied the motions for an appointment of a receiver, for the partial payment of plaintiff's claim and for an election of a recovery option. The court also directed that the matter be submitted to a referee who would determine the value of the estate's interest in the partnership assets as of December 31, 1964 and as of December 31, 1971 as well as the estate's share in the post-dissolution profits from December 31, 1964 to December 31, 1971.

Hearings before the referee were conducted in March and April, 1973. Thereafter, on August 13, 1973 the referee rendered his final report in which he valued the estate's share in the partnership assets at $265,079.74 as of December 31, 1964 and at $367,002 as of December 31, 1971. He also determined that the estate's share in the post-dissolution profits was $233,866.75.

On October 9, 1973 plaintiff moved to confirm most of the

referee's report and to reject those portions which were unfavorable. Plaintiff also sought, *inter alia,* to hold open its election of a recovery option, to receive compound interest, and to recover costs, special costs and the referee's fees and expenses from defendants. Defendants thereupon cross-moved to reject the referee's report, except for several minor points decided in their favor, to compel election of a recovery option and to deny compound interest and costs.

In an order entered on May 13, 1975 the court accepted without modification the referee's valuation as to the plaintiff's share in the post-dissolution profits. With respect to the value of the plaintiff's share in the partnership assets, the court decreased the referee's December 31, 1964 valuation to $244,041.35 by rejecting his determination that deferred mortgage expenses and deferred leasing commissions in the amount of $63,115.15 were real assets of the partnership and it increased the referee's December 31, 1971 valuation to $398,850 by adding $95,544 paid as management fees to Maurice Rosen. The court also denied compound interest but assessed costs, special costs and the referee's fees against defendants.

The final order and judgment, which was entered on May 19, 1975 and which merely elaborated upon the order of May 13, 1975, reflected plaintiff's election to receive one third the value of the partnership assets as of December 31, 1964 together with one third of the post-dissolution profits between December 31, 1964 and December 31, 1971. Plaintiff's total one-third share in the partnership was determined to be $477,908.10. After an appropriate deduction for defendants' prior payment of $48,717.55 and the addition of costs and interest from January 31, 1972 to May 19, 1975, final judgment in plaintiff's favor was entered in the amount of $532,427.74. It is from this judgment as well as from the interlocutory judgment and the orders of December 28, 1972 and May 13, 1975 that plaintiff and defendants appeal.

The first issue to be decided on this appeal is whether, in the interlocutory judgment of October 8, 1970, the court erred in refusing to allow Maurice Rosen to retain management fees and leasing commissions, except those management fees paid or accrued prior to Harold Rosen's death in 1964.

In spite of the express language to the contrary in the partnership agreement, defendants attempt to justify the payment of compensation for these services on three alternative

grounds: first, that they were extraordinary services rendered in the continuation of an ongoing business; second, that they were properly compensable services in liquidation of the partnership; and, third, they were compensable under the terms of an oral agreement which effectively modified the provisions of the partnership agreement.

Generally, the services of one partner are rendered for the common benefit of all and, absent some specific provision in the partnership agreement, the partner so rendering these services is not entitled to special compensation *(Levy v Leavitt,* 257 NY 461, 467). It is accepted that the subsequent division of profits constitutes the only reward for such services. This is true even in those situations where the parties at the time the partnership was begun clearly did not contemplate that such services would eventually be required *(Levy v Leavitt, supra).* Thus, the mere fact that such services were extraordinary, in that they were above and beyond any service envisioned by the parties, does not automatically justify compensation.

However, an exception to this rule has been recognized where the services are rendered after technical dissolution but while the partnership is continued as an ongoing business. Thus it has been held that "where the surviving partner has in good faith and with consent of the heirs and next of kin of the deceased partner continued the business with profit, the latter were given the option of either sharing in the profits or requiring him to account for their decedent's share in the profits; and where they elected to share in the profits, an equitable allowance was made to the surviving partner for his services. *(McGibbon v. Tarbox,* 144 App. Div. 837.)" *(Germann v Jones,* 220 App Div 5, 8.) The grant of this compensation is based solely upon the equities of the situation and is usually premised upon some express consent or tacit acquiescence on the part of the deceased partner's estate in the activities of the survivors *(Germann v Jones, supra;* see, also, *Greenslete v Ferguson,* 191 App Div 745; but, see, contra, *Ongley v Marcin,* 214 App Div 455 [3:2 decision]).

The record in the instant case establishes that, despite defendants' duty to liquidate the partnership with reasonable promptness, the surviving brothers carried on the business and operated it in essentially the same manner as they had prior to Harold Rosen's death. Thus it cannot be reasonably argued that Maurice Rosen's post 1964 management and

leasing activities were performed in the liquidation of a dissolved partnership. However, it also cannot be seriously questioned that the continuation of the business was undertaken without plaintiff's consent and in direct defiance of the plaintiff's demands for dissolution and liquidation. Thus, despite the fact that plaintiff has elected to share in the post-dissolution profits, under these circumstances the application of the exception to the general rule of denying compensation would be inequitable.

In light of our conclusion that the partnership has been conducted as an ongoing business since 1964 the services of Maurice Rosen are not alternately compensable as being rendered in liquidation of the partnership. Even if we did hold that the partnership was in the process of liquidation, Maurice Rosen would still not be entitled to compensation. Subdivision 6 of section 40 of the Partnership Law provides that, absent any agreement to the contrary, "a surviving partner is entitled to reasonable compensation for his services in winding up the partnership affairs." Since paragraph 11 of the partnership agreement in this case specifically provides that "[n]o compensation shall be paid to the surviving partners for their services in liquidation", that provision would supersede the statute and operate to deprive Maurice Rosen of compensation for his services.

We do, however, find that defendants have properly established that the partnership provision relating to the payment of compensation for services rendered in the course of the business was effectively modified by an agreement between the partners and, based upon this modification, Maurice Rosen is entitled to management fees from 1964 to 1971.

At the original trial of this action, Herbert Rosen testified that there was an oral agreement among all three brothers that, in spite of the language of the partnership agreement, appropriate management fees and leasing commissions would be paid to Maurice. This testimony was corroborated by that of Maurice Rosen who stated that, since the inception of the partnership in 1958, management fees had been regularly paid to him through his wholly-owned company, M. L. Rosen Management Co. He did not, however, regard these payments as compensation since they did not, in fact, cover the actual operating expenses of his company in providing management, janitorial and maintenance services on the partnership properties.

Maurice did admit that prior to Harold's death he had neither received payment for any leasing commissions nor had any credit for these commissions accrued on his account in the partnership books. He testified that since the partnership was created as a tax shelter and was, by its very nature, not designed to show a profit for several years, the brothers agreed to defer either accrual or payment of his leasing commissions until such time as the partnership began to register a profit. These commissions could then be used as an expense to offset any taxable profit.

It is well established that where the intention of the parties to a partnership agreement is expressed plainly in the language of the agreement, such intention is not open to speculation (Matter of Hollander, 19 AD2d 445) and parol evidence cannot be admitted to vary or change the language of the agreement (Fazio v Tracy, 39 Misc 2d 172). However, it is equally true that any written agreement, even one which provides that it cannot be modified except by a writing signed by the parties, can be effectively modified by a course of actual performance (All-Year Golf, Inc. v Products Investors Corp., 34 AD2d 246).

In the instant case, the partnership books indicate that Maurice Rosen was paid management fees during the years 1958 to 1964. Since the annual financial statements encompassing these payments were sent to all the partners and since no objections were raised concerning these payments prior to Harold's death, it is clear that the parties altered the terms of the partnership agreement by their acceptance of this compensation as a legitimate expense. In such a situation, it was error for the court to refuse compensation for management services from 1964 to 1971. These fees, totaling $95,544, should be paid to Maurice Rosen and charged off against income in computing the profits for those years.

We do not, however, reach the same conclusion with respect to the leasing commissions. The partnership books show that the first entry of this expense was not made until after Harold Rosen's death. Since there is no indication, save Herbert's and Maurice's testimony, that the partners in fact modified the compensation provision as regards these commissions, the disallowance of compensation for these services was proper.

The second question presented on this appeal is whether the court, in the interlocutory judgment of October 8, 1970, erred in holding that plaintiff had failed to establish its claim to the

$50,000 commission allegedly earned by Harold Rosen during his lifetime.

At the trial, Harold Rosen's widow testified that the money was received by her husband from Metropolitan Structures, a limited partnership in which all three brothers were involved to some extent, as a commission for his work in certain negotiations on property in Baltimore, Maryland. According to her, this money was subsequently loaned to the partnership by her husband and, after his death, both Maurice and Herbert admitted that the money was a loan and they intended to pay it back.

Although the surviving brothers conceded that they may have spoken to Harold's widow, they categorically denied at trial that the money was intended as a loan or that they had promised to return anything. They also testified that the money was deposited in the partnership account, charged as partnership income, and divided equally among the three partners, each of whom paid one third of the taxes on it. This was supported by an examination of the partnership books. Furthermore, it is undisputed in the record that although the money was received by the partnership in 1961, up to the time of his death in 1964, Harold Rosen had made no claims on the money nor had he protested its division among the brothers.

Although plaintiff is correct in asserting that the court erred in ruling that plaintiff had the burden of establishing that the money was not partnership funds (see *Cahill v Haff,* 248 NY 377), in light of the evidence presented, this error does not mandate reversal. It is well settled that "[i]n the absence of an express agreement, the test by which to determine whether property is partnership or individual property is to fix its status with reference to the firm business. Consideration must be given to the following: how the property was brought into the firm, the purpose, and *how it was treated by the partners in the partnership operations and transactions."* (Sugarman, Partnership, § 77 [4th ed 1966]; emphasis supplied.) Thus, in spite of the court's erroneous placement of the burden of proof upon plaintiff, we nevertheless hold that the record supports the ruling that the $50,000 commission was, in fact, partnership funds and not a loan from Harold Rosen.

The third contention presented here is that the court erred in directing that the partners' loan account be repaid prior to the equal distribution of the net assets among the brothers. Specifically this contention concerns whether certain amounts,

credited to Herbert and Harold as "loans" as of 1964, were in fact loans or whether they were in essence further contributions to capital.

The testimony adduced at trial indicated that the "loans", amounting to $73,126.25 each for Herbert and Harold, were listed under the equity portion of the partnership's balance sheet and not under the liabilities section; that the capital account of the partnership was severely impaired; that there was no evidence that the "loans" could be withdrawn at will nor was there any interest charged; that the amounts of the "loans" were over and above the partner's initial capital contribution obligation of $17,000 and that Maurice Rosen had previously stated that the partners' loans would be repaid before capital distribution. However, inasmuch as these amounts, whether regarded as loans or capital contributions, were entitled to be repaid prior to a distribution of the net assets of the partnership, we need make no determination as to the precise status of these moneys.

Subdivision (b) of section 71 of the Partnership Law provides that, in the absence of any agreement to the contrary, the liabilities of a partnership shall be paid in the following order or priority:

"I. Those owing to creditors other than partners,

"II. Those owing to partners other than for capital and profits,

"III. Those owing to partners in respect of capital,

"IV. Those owing to partners in respect of profits."

Although partnership capital is defined as the aggregate of the sums contributed by the partners for the purpose of commencing or carrying on the partnership business and intended to be risked in the business (M. & C. Creditors Corp. v Pratt, 172 Misc 695, affd 255 App Div 838, affd 281 NY 804), advances or loans made by a partner to the firm are not considered capital of the partnership (Sugarman, Partnership, § 73, citing Lindley, Law of Partnership [5th ed], § 320). Thus, a partner's loans would properly be distributed immediately after liabilities owing to creditors other than partners (Partnership Law, § 71, subd [b]). Since the partnership agreement in the instant case made no provision concerning the payment or distribution of a partner's loans or capital, the statutory priority is applicable and, regardless of whether these amounts are denominated as loans or capital contributions,

they are entitled to repayment before distribution of the net assets of the partnership.

The fourth contention raised in this case concerns the referee's computation of post-dissolution profits and involves three major subpoints: first, whether the referee erred in denying the partnership a deduction for depreciation of its real properties and in allowing deductions for certain deferred leasing commissions payable to third parties and deferred mortgage expenses; second, whether the referee erred in including as profits the partnership's gain realized by the sale of the Skokie, Illinois property in 1971; and, third, whether the referee erred in excluding the gain realized on certain stock transactions.

Although section 71 of the Partnership Law provides specific rules for the distribution of the assets of a partnership, there are no similar statutory guidelines as to the accounting principles to be employed in valuing a partner's interest in the business. Thus it has been said that in resolving a dispute between partners over the valuation of the partnership assets after dissolution, the court must turn either to the accounting principles which the partners agreed to use or to their custom and practice (Soechtig v Amick, 285 App Div 701, 705).

Turning then to the propriety of the denial of the depreciation deduction, it is undisputed in the record that since the inception of the partnership, depreciation has been deducted in the computation of the income of the business. Indeed both plaintiff's and defendants' accountants testified that with respect to the profits of an ongoing business, depreciation is a proper item of expense. Furthermore, in determining the net taxable income of the individual partners, each of the three brothers had, from 1958 to 1964,[1] received the benefit of the depreciation deduction on his personal tax return. However, this does not in and of itself necessitate the conclusion that depreciation should properly be deducted in ascertaining the estate's share of the post-dissolution profits.

"The allowance for depreciation is primarily intended to provide a nontaxable fund to restore property used in producing income at the end of its useful life, when its capacity to produce income has ceased" (4 Mertens, Law of Federal Income Taxation [Rev 1973], § 23.01). It has further been said

---

1. It is clear from the record that from 1964 to 1971 the income from the partnership was divided solely between the two surviving brothers and that 50% of the tax deduction for depreciation was claimed by each.

that the depreciation deduction is designed "to permit the taxpayer to recover his capital investment in wasting assets free of income tax" *(id., § 23.04)*. To the extent that the deduction serves to reduce the amount of a partner's taxable income from the property, it operates only as a tax benefit and does not reflect a practical decrease in the partner's actual income from the property.

Defendants, however, contend that, when considered in terms of accounting principles, depreciation, insofar as it reflects the amortized expense of the actual cost of the property, must be allowed as a legitimate business expense in the computation of the partnership's profits.

It cannot be disputed that from 1965 to 1971 the surviving partners received income from the partnership's assets which was unreduced by any depreciation. In declaring this income on their personal tax returns, Herbert and Maurice each subsequently utilized one half of the permissible depreciation deduction to shelter a portion of this income from taxation. The fact, however, that these moneys were sheltered from taxation does not mean that they were unreceived.

Had Harold Rosen lived until 1971 he too would have received his proportionate share of the income from these properties before any depreciation allowance was deducted. He would have reported this income on his individual tax returns and then by subtracting one third of the allowable depreciation, he too could have sheltered part of this income from taxation. Therefore, in applying the equitable remedy of an accounting, in order to place plaintiff in the same position which decedent would have been in had he lived, it is only just to distribute the income from these properties before adjusting it by deducting depreciation.

This does not mean that the surviving brothers will bear a greater share of the actual cost of the assets. Since depreciation is admittedly a noncash expense which results primarily in a tax benefit to the person claiming the deduction, it would be patently unfair to permit defendants to receive this tax benefit and yet charge off depreciation as a cash expense against plaintiff's share of the partnership's profits.

Accordingly, we hold that the court properly denied the deduction of depreciation allowance in the amount of $450,380.28 in computing the total post-dissolution profits of the partnership from 1965 to 1971.

The same analysis does not hold true for the deferred

leasing commissions and the deferred mortgage expenses and, contrary to plaintiff's assertions, these deductions were properly allowed in computing post-dissolution profits.

Inasmuch as mortgage expenses not only may reflect an additional cost in the purchase of real property but also, in a refinancing situation, may reflect a legitimate recurring expenditure, such expenses are "costs" of an ongoing business. As such they are properly deductible either in a lump-sum manner or, as here, on an annual amortized basis. The same is true for the deferred leasing commissions. Since the business of the partnership was the construction and leasing of rental properties, the cost of obtaining such leases is a legitimate offset to the rentals derived therefrom.

We do, however, find error in the referee's inclusion of the $95,681 gain realized on the 1971 sale of the Skokie, Illinois property in his determination of post-dissolution profits. In making its election as to the method of recovery, albeit after the referee's determinations, plaintiff elected to receive its one-third interest in the partnership assets valued as of December 31, 1964 plus one third of the post-dissolution profits up to the date of the judgment. Implicit in this election is the right to receive a proportionate share of any increase in the fair market value, but only up to 1964. After that date subsequent increases would be reflected merely in the total net worth of the partnership and not in its annual income or profits. These subsequent increases would inure only to the benefit of the surviving partners upon the eventual sale of the properties.

The fact that such a sale occurred during the period of accounting should not, in our opinion, alter the basic rationale of the election. Although a "gain" was in fact realized on the sale of the Skokie, Illinois property, this gain is properly attributable to the increase in the fair market value of the property. Since plaintiff's share of that fair market value was, pursuant to its election, immutably fixed at the December 31, 1964 valuation date, a share of this subsequent increase was not properly distributable to plaintiff and should not have been added to the post-dissolution profits.

Under the final subpoint of this fourth contention, plaintiff argues that the referee erred in not including as post-dissolution profits the gain realized by Maurice Rosen on a "short-sell" transaction in Helene Curtis stock. The evidence, however, establishes that this transaction, although involving all

three brothers in some way, was not connected with the partnership. It was rather undertaken by Maurice as an individual at the request of Harold Rosen who, as an executive of Helene Curtis, could not "short-sell" the stock. The money for the transaction did not come from partnership funds nor were the proceeds after the sale deposited in the partnership account. While it is true that certain legal fees amounting to $141, incurred with respect to this transaction, were charged to the partnership, Maurice Rosen admitted that this was done in error and stipulated that it would be repaid. Thus, while plaintiff may have a valid claim against Maurice personally, that claim does not involve the partnership and the referee was correct in refusing to include this gain in post-dissolution profits.

The fifth question presented on this appeal concerns whether the plaintiff's share of post-dissolution profits should be the same as decedent's equitable percentage share of the partnership's total assets as of December 31, 1964 which was 38%. This distribution was rejected by the court in its interlocutory judgment of October 8, 1970 and plaintiff was limited to a 33 1/3% share of the post-dissolution profits.

Section 73 of the Partnership Law provides in part as follows: "When any partner retires or dies, and the business is continued under any of the conditions set forth in section seventy-two, subdivisions one, two, three, five and six, or section sixty-nine, paragraph (b) of subdivision two, without any settlement of accounts as between him or his estate and the person or partnership continuing the business, unless otherwise agreed, he or his legal representative as against such persons or partnership may have the value of his interest at the date of dissolution ascertained, and shall receive as an ordinary creditor an amount equal to the value of his interest in the dissolved partnership with interest, or, at his option or at the option of his legal representative, in lieu of interest, *the profits attributable to the use of his right in the property of the dissolved partnership"*. (Emphasis supplied.)

In rejecting the 38% ratio the court stated that this statutory provision was superseded by article 4 of the partnership agreement, which provided that net profits or losses be divided equally, and by article 5, which provided that "[n]o additional share of profits shall inure to any partner by reason of his capital or income account being proportionately in excess of the capital or income accounts of the others." However, it is

clear from a reading of the entire agreement that these provisions do not specifically apply to post-dissolution distribution. In the absence of such specific application, the predissolution percentage shares do not serve to supersede the statutory share of section 73 of the Partnership Law (see *Meyer v Meyer,* 201 App Div 596). Thus we hold that the court erred in limiting plaintiff's share in the post-dissolution profits to 33 1/3%.

In implementing the provisions of section 73, it is necessary to ascertain the ratio of the decedent's share in the assets of the partnership to the total assets (see *Klein v Acco Prods.,* 79 F2d 512; *Cahill v Haff,* 248 NY 377, *supra).* In the instant case, the total net worth of the partnership, as of December 31, 1964, was $629,631.85. Included in this amount are various loans from the partners totaling $123,338.53 of which $73,126.25 was payable to the decedent. By subtracting these loans from the total net worth, we arrive at the net equity of the partnership which, in this case, equals $506,293.32. Plaintiff's share in this amount, by the terms of its election, was one third or $168,764.44. By adding to that share the value of the above loans payable to Harold Rosen, we reach the plaintiff's total value in the assets of the partnership, amounting to $241,890.69. When this figure is proportionately compared to the total net worth of the partnership ($629,631.85), we arrive at a ratio of 38% which reflects plaintiff's percentage share in the post-dissolution profits for the period 1965-1971.

We do not find any merit in defendants' contention that Special Term was without authority to require them to account additionally for the profits in 1971. While admittedly the original interlocutory judgment only directed that defendants account up to the date of that judgment, August 31, 1970, we do not feel that, under the circumstances of this case, Special Term's extension of that period amounted to an improper amendment of a judgment by a court of concurrent jurisdiction.

It appears obvious that in its interlocutory judgment of October 8, 1970, the court envisioned that defendants' accounting would be submitted within 60 days and that, subject to any modification of its valuations, confirmation of that accounting would result shortly thereafter. However, this did not occur at least in part because of defendants' failure to submit their accounting on schedule. While we do not condone plaintiff's subsequent successful ex parte attempt to submit its

own accounting and, in fact, feel that defendants were justified in appealing the supplemental order, it is important to note that defendants did not perfect this appeal until sometime after May 6, 1971, five months after the issuance of the order. Furthermore, defendants did not finally submit their own accounting until March 9, 1972.

In light of this protracted delay, which was clearly not envisioned by the terms of the interlocutory judgment, and in view of the fact that an accounting action is by its very nature an equitable proceeding, Special Term was fully justified in requiring defendants to account for the year 1971. This supplemental order does not, in our opinion, "correct by amendment [an] error in substance affecting the [original] judgment" (Herpe v Herpe, 225 NY 323, 327) and the cases cited by defendants, insofar as they do not involve equitable remedies, are inapposite.

The sixth question raised on this appeal relates to the propriety of the final determination of the value of the partnership assets as of December 31, 1964. In challenging this valuation defendants contend that the referee in the accounting action erred in receiving the appraisal reports of Harvey Jeffers into evidence and in permitting him to testify concerning its contents. They maintain that Jeffers was hired and paid jointly by the parties pursuant to a stipulation entered into between them early in the litigation, and that the purpose for hiring him was solely to obtain an independent valuation for use in settlement negotiations. It is defendants' position that the appraisal reports furnished by Jeffers constituted a confidential communication which was privileged and could not be used in evidence without their consent; that Jeffers, as an expert witness paid by both parties, should not be allowed to testify for one against the other; that the stipulation under which he was retained did not provide for his testifying in court; that permitting him to testify would tend to discourage settlement negotiations, and that, in any event, he was their agent and owed them a duty not to betray their interests.

We think that the admission of the Jeffers' testimony was in all respects proper. The law extends testimonial privileges to communications between husband and wife (CPLR 4502); attorney and client (CPLR 4503); physician and patient (CPLR 4504); clergyman and parishioner (CPLR 4505); psychologist and patient (CPLR 4507); and social worker and client (CPLR

4508). It extends no privilege to communications between a real estate appraiser and the person who hires him. Furthermore, the basis for all recognized privileges is the confidentiality of the communication. Here, there was no such confidentiality since the appraiser's report was freely available to plaintiff and defendants alike.

*Maglione v Cunard S.S. Co.* (30 AD2d 784), *Gnoj v City of New York* (29 AD2d 404), *Gugliano v Levi* (24 AD2d 591) and other authorities cited by defendants to the effect that an expert witness engaged by one party should not be forced to testify for the other are inapplicable to this situation. In those cases the expert witness was originally retained and paid exclusively by one of the parties. The rule adopted was one which prevented the opposing party from luring his adversaries' witness into his own camp. No such problem obtains here since Jeffers was retained and paid not by defendants alone but by both parties pursuant to their mutual agreement. As a consequence, his appraisal was especially valuable since it was not influenced by partisan considerations. As Justice MEAD stated in his decision of January 29, 1975 confirming the referee's report: "It would be a waste of time and money if all the parties to a lawsuit agreed to employ an expert and then his resultant work could not be used, because one or more, but not all of the parties, rejected the expert's opinion."

Moreover, we do not see how the contractual arrangements made by the parties with Jeffers affects the application of the rules of evidence or how the use of testimony such as that given here would have an adverse effect upon settlement negotiations.

Defendants also claim that the court's determination of the value of the partnership assets was erroneous in that the referee's valuations of the five pieces of real property, which were accepted by the court, were improper since the referee failed to set forth a basis for his ultimate findings of value.

CPLR 4213 (subd [b]) which states that "[t]he decision of the court * * * shall state the facts it deems essential," encompasses facts upon which the rights and liabilities of the parties are based and does not include evidentiary facts *(Metropolitan Life Ins. Co. v Union Trust Co.,* 268 App Div 474, affd 294 NY 254). This requirement of stating essential facts extends also to a decision of a referee *(Owens v Owens,* 281 App Div 884; 282 App Div 734; *People ex rel. Central New England Ry. Co. v State Tax Comm.,* 261 App Div 416).

In the instant case, although defendants submitted a request for findings of fact on which ultimate valuations of the real property would be based, the referee merely set forth his ultimate valuations. Thereafter, at the judicial confirmation proceedings, the court ruled that the referee's decision set forth sufficient facts so that a reference back for further findings was unnecessary. Defendants now urge that a *de novo* determination of value by this court is mandated.

In comparing the issue in this case to the analogous question which arises in condemnation proceedings, it is clear that the referee erred in failing to make specific findings as to the rental values, expenses, vacancy allowances, percentage return on land and capitalization rates (see *City of Niagara Falls v William Young Transp.*, 41 AD2d 899; *Motsiff v State of New York*, 32 AD2d 729). In such situations we have assumed the burden of re-evaluating the proof and making additional findings of fact in order to avoid the inevitable delays incident to a remand of the case *(Matter of City of Rochester*, 32 AD2d 731). This same procedure is applicable here.

It is clear from an analysis of the ultimate findings of value that the referee based three of his conclusions upon the appraisal reports of Harvey Jeffers. These valuations include the properties at 614 James Street and 901 Lodi Street in Syracuse and the property at 737 Delaware Avenue in Buffalo. Having reviewed the various other appraisals relating to these properties, we find ourselves in complete agreement with the referee's determinations as to their value and we, accordingly, make the following findings of fact.

With respect to the property at 614 James Street, we find under the economic approach that the gross annual rental was $39,624 and that there was a 3% vacancy and collection loss of $1,189, leaving an effective gross income of $38,435. From this the following expenses must be deducted: taxes, $9,469; insurance, $450; maintenance and repairs, $400; management, $1,922, and miscellaneous, $7,910. Subtracting the total of these expenses, $20,151, from the gross income of $38,435, leaves a net annual income of $18,284 of which $3,600 was attributable to the land; thus $14,684 was attributable to the improvement. If we capitalize this at 8%, we arrive at a building value of $183,550 to which must be added the market value of the land at $60,000, giving a combined total of $243,550. By subtracting an adjustment of $5,514

which represents the difference between the theoretical economic rent and the actual rent received, we reach a total value of $238,036 which we round off to $238,000.

With respect to the property at 901 Lodi Street, we find under the economic approach that the gross annual rental was $33,915 and that there was a 3% vacancy and collection loss of $1,017, leaving an effective gross income of $32,898. From this the following expenses must be deducted: taxes, $7,361; insurance, $350; maintenance and repair, $700; management, $1,645, and miscellaneous, $7,430. Subtracting the total of these expenses, $17,486, from the gross income of $32,898, leaves a net annual income of $15,412 of which $3,600 was attributable to the land; thus $11,812 was attributable to the improvement. If we capitalize this at 8%, we arrive at a building value of $147,650 to which must be added the market value of the land at $60,000, giving a combined total of $207,650. By subtracting an adjustment of $11,979 which represents the difference between the theoretical economic rent and the actual rent received, we reach a total value of $195,671 which we round off to $195,000.

With respect to the property at 737 Delaware Avenue, we find under the economic approach that the gross annual rental was $150,548 and that there was a 3% vacancy and collection loss of $4,516, leaving an effective gross income of $146,032. From this the following expenses must be deducted: taxes, $15,412; insurance, $1,800; maintenance and repairs, $2,400; management, $7,302, and miscellaneous, $37,600. Subtracting the total of these expenses, $64,514, from the gross income of $146,032, leaves a net annual income of $81,518. Since the land was not owned by the partnership but was rather leased by it under a long-term arrangement, no part of this net annual income is attributable to the land nor can the actual value of that land be included in determining the value of this partnership asset. Thus, if we capitalize the net annual income at an 8% rate, we arrive at an unadjusted building value of $1,018,970 and by adding a vacancy adjustment of $21,754 and subtracting a rental deficiency factor of $113,811, we reach a final value of $926,913 which we round off to $925,000.

With respect to the referee's determination of the value of the Skokie, Illinois property it is again obvious that he accepted the appraisal prepared for the plaintiff by Eugene Stunard. He properly rejected the other appraisals submitted

by both plaintiff and defendants inasmuch as those other appraisals relied upon the market data approach to value the properties. Since the economic approach, relied upon by Stunard, is preferable where, as here, the properties are being rented and the owner is receiving rental income *(Matter of City of New York [Lincoln Sq. Slum Clearance Project],* 15 AD2d 153, affd 12 NY2d 1086, 16 NY2d 497), the referee's reliance upon the Stunard valuation is justifiable. Furthermore, the other appraisals submitted failed to include specific adjustments between the comparables and the subject and did not sufficiently state the factors considered by the appraiser. For this reason alone, their reliability is suspect (see *Geffen Motors v State of New York,* 33 AD2d 980). Accordingly, we agree with the referee's final determination of value and we make the following findings of fact with respect to the property at 7440 Long Avenue in Skokie, Illinois. We find under the income approach that the net income was $34,737.60. By subtracting from this figure the annual debt service of $24,768 we arrive at a cash dividend of $9,969.60. If we capitalize this dividend at an 8% rate, we reach an adjusted amount of $124,620. By adding to that the loan balance of $289,326.78 we arrive at a total value of the property of $413,946.78 which we round off to $414,000.

Inasmuch as neither party contests the court's findings of value for the property at 221 East Avenue in Syracuse, the final question concerns the value of the partnership property at 817 East Willow Street in Syracuse. In finding an ultimate value of $160,000, which fell within the range of the expert testimony, the referee did not specifically adopt any one appraiser's actual computations. It appears, however, that he relied most heavily upon an appraisal prepared for the plaintiff by Hawley Van Swall which set the value of the property at $165,400.

In his valuation of the land, however, we note that Van Swall relied upon as a comparable the sale of certain land to a church in Syracuse. Since the record indicates that the church needed specific adjoining properties in order to extend the parking lot, this sale reflected a necessarily inflated market value. Thus, while we agree with his computations as to the value of the building, we hold that his valuation as to the land must be reduced. In analyzing the other appraisers' valuations with respect to the land, we find that defendants' appraisal of

the land amounting to $26,200 more properly reflects the actual value of the real property.

Accordingly, we make the following findings with respect to this property. Under the economic approach the gross annual rental for this property was $27,230 and there was a 4% vacancy and collection loss of $1,089, leaving an effective gross income of $26,141. From this the following expenses must be deducted: taxes, $3,500; insurance, $250; maintenance and repairs, $375; management, $1,307, and miscellaneous, $4,650. Subtracting the total of these expenses, $10,082, from the gross income of $26,141, leaves a net annual income of $16,059 of which $2,165 was attributable to the land; thus $13,894 was attributable to the improvement. If we capitalize this at 9%, we arrive at a building value of $154,378 to which must be added the market value of the land at $26,200, giving a combined total of $180,578. By subtracting an adjustment of $22,278 which represents the difference between the theoretical economic rent and the actual rent received, we reach a total value of $158,300.

We find no merit in defendants' assertion that the December 31, 1964 value ascribed to the partnership properties by the referee must be rejected on the ground that the referee failed to give proper weight to certain estate tax appraisals prepared by plaintiff shortly after Harold Rosen's death. These appraisals were, in our opinion, properly submitted to the referee and there is no evidence in the record that he disregarded them.

While it is true that these appraisals, which valued the estate's share in the partnership assets at $31,000, formed the basis for the estate tax computations, they were not absolutely binding upon plaintiff. They represent merely the appraiser's opinions as to value and, inasmuch as the appraiser who prepared them did not testify before the referee nor did the appraisals reflect the factors analyzed in reaching the ultimate values of the properties, the referee was correct in assigning these values little weight. Furthermore, there is no indication that these appraisals were contested in an estate tax proceeding and, absent this type of prior adjudication, they are not properly controlling here (see *Matter of City of New York [Lincoln Sq. Slum Clearance Project],* 15 AD2d 153, 164, *supra).*

Defendants' final contention is that the court erred in allowing a referee's fee in the amount of $3,600 as a taxable

disbursement assessed against them as part of the costs and in awarding plaintiff an additional $3,000 cost allowance pursuant to CPLR 8303 (subd [a], par 2).

They maintain that since no provision for the referee's fee was made in the order of reference, as is required by CPLR 4321, the statutory fee of $25 per day as provided by CPLR 8003 (subd [a]), applies. Under the circumstances of this case we cannot agree. The original proceedings before the referee, held to be a nullity by virtue of our decision in *Rosen v Rosen* (38 AD2d 881, *supra),* were conducted pursuant to an order of reference which specified that the referee would be paid a per diem fee of $300. Although the second order of reference contained no such provision, the parties then proceeded to appear a second time and to have their claims redetermined. It is only reasonable to conclude that in such a posture everyone assumed the original $300 per day fee still applied. We cannot believe that attorneys as astute as these would fail to specify that a lower fee, or the statutory $25 per day fee, was to be in effect if that was their actual intent. Indeed, we feel sure that these counselors determined that the most provident course to follow was to go along with the $300 per day fee set previously rather than to quibble over the referee's compensation prior to his passing judgment on the matters at issue. The referee reported to the court that he spent 68 hours on the case which at a reasonable pace of about six hours per day amounts to approximately 12 days' work or $3,600 at $300 per day.

Nor can we find that the court's award of $3,000 extraordinary costs was unwarranted. CPLR 8303 (subd [a], par 2) provides that the court may, in its discretion, make an additional award of costs, up to $3,000, "to any party to a difficult or extraordinary case". In matters clearly within the court's discretionary powers, we should not disturb Special Term's determination unless there has been a clear abuse *(Siegler v Massachusetts Acc. Co.,* 255 App Div 1031). Here, the award of extraordinary costs to plaintiff was proper since this protracted litigation would have been unnecessary had defendants liquidated promptly to begin with. Moreover, the complexity of the issues presented herein bear more than adequate witness to the fact that this is both a difficult and an extraordinary situation.

In summary, the interlocutory judgment of October 8, 1970 should be modified insofar as the court failed to allow a

deduction of $95,544 in management commissions from post-dissolution profits and insofar as it limited plaintiff's share of post-dissolution profits to 33% rather than 38%, representing Harold Rosen's proportionate share in the net assets of the partnership; as so modified, it should be affirmed. The order of December 28, 1972 should be affirmed. The order of May 13, 1975 and final judgment of May 19, 1975 should be modified insofar as the court included a gain of $95,681 realized from the sale of partnership property in Skokie, Illinois in post-dissolution profits and insofar as it assigned a 1964 value of $160,000 rather than $158,300 to partnership property at 817 East Willow Street in Syracuse.

Therefore, on the basis of undisputed partnership assets as well as our *de novo* findings of value previously set forth, the total assets of the partnership as of December 31, 1964 were $2,187,697.85.[2] The undisputed total liabilities as of the same date were $1,558,066 leaving the partnership with a net worth of $629,631.85. Deducting $123,338.53, the adjusted balance of the partners' loan accounts, from this figure we reach a net equity in the partnership of $506,293.32. Plaintiff's one-third share of this amount equals $168,764.44 and by adding $73,126.25, the amount of the partnership loans payable to Harold Rosen, we reach a figure of $241,890.69 which represents plaintiff's share of the net partnership assets as of December 31, 1964.

The post-dissolution profits of the partnership from January 1, 1965 through December 31, 1971, as found by the referee, totaled $701,600.24. Deducting management commissions in the amount of $95,544 and the gain on the sale of the Skokie, Illinois property in the amount of $95,681, we arrive at a net post-dissolution profit of $510,375.24. Applying a rate of 38% to this sum we find plaintiff's proportionate share to be $193,942.59.

Therefore the order of May 13, 1975 and judgment of May 19, 1975 should be further modified to provide that judgment be entered in favor of plaintiff in the amount of $241,890.69 for assets plus $193,942.59 for profits plus costs in the amount

2. This figure includes the value of the six pieces of partnership real property ($2,159,300), the undisputed current assets ($25,416) and the other assets of the business ($2,981.85). It excludes, however, from "other assets" certain management fees totaling $4,752 which were listed as owing from Maurice Rosen. In light of our holding that these fees were properly payable to him, this "debt" should not be included in the total assets.

of $6,973.40 for a total of $442,806.68 with interest on this amount in the manner provided for by the order of May 13, 1975 and the judgment of May 19, 1975. Except as herein modified the aforesaid order of May 13, 1975 and the judgment of May 19, 1975 are otherwise affirmed.

MARSH, P.J., SIMONS, GOLDMAN and WITMER, JJ., concur.

Orders and judgments unanimously modified and affirmed, without costs in accordance with opinion by MOULE, J.